FILED

2020 NOV 02  P 05:25
CIVIL
DISTRICT COURT

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

## STATE OF LOUISIANA

NO. 2020-00881                                          SECTION: F-7

### BRENT DEAVILLE

### VERSUS

### ANCO INSULATIONS, INC., *ET AL.*

FILED: _____        DEPUTY CLERK: _____

### JOINT PRE-TRIAL ORDER

**NOW INTO COURT**, comes now Plaintiff and Defendants, Exxon Mobil Corporation, Ferguson Enterprises, Inc., J-M Manufacturing Company, Inc., Taylor-Seidenbach, Inc., and Turner Industries Group, LLC, in the above entitled and numbered cause, for the purpose of filing this Joint Pre-Trial Outline.

**1.    PRE-TRIAL CONFERENCE:**

A Pre-Trial Conference of attorneys will be held in this matter before Honorable Christopher Bruno, District Judge, Division "F-7" on **a date to be determined by this Court.**

**2.    COUNSEL TO BE PRESENT:**

**a. Attorneys for Plaintiff**

**SIMMONS HANLY CONROY LLC**
Gary Dimizuo, admitted *pro hac vice*
Melissa Schopfer, admitted *pro hac vice*
Mike Hibey, admitted *pro hac vice*
Jean-Michel Lecointre, admitted *pro hac vice*
One Court Street
Alton, IL 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com

**THE CHEEK LAW FIRM LLC**
Lindsey A. Cheek, Bar No. 34484
Jeanne St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130

VERIFIED

No. 2020-00881

Yanley Salazar
2020 NOV 05  A 10:27

E-Filed

**Exhibit A**

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com

**STUEMKE LAW FIRM LLC**
Jay Stuemke, admitted *pro hac vice*
P. O. Box 92970
Southlake, TX  76092
Telephone:  817-379-1149
Jay@stuemkelaw.com

b. **Attorneys for Exxon Mobil Corporation**

David M. Bienvenu, Jr., #20700
John Allain Viator, #25915
Lexi T. Holinga, #30096
Anthony Lascaro, #32546
Melissa Jade Shaffer, #37867
Thomas C. Naquin, #38847
4210 Bluebonnet Blvd.
Baton Rouge, LA 70809
Phone: (225) 388-5600
Fax: (225) 388-5622
asbestos@bblawla.com

and

CHEHARDY SHERMAN WILLIAMS
James M. Williams (#26141)
Inemesit U. O' Boyle (#30007)
Daniel E. Buras, Jr. (#26226)
Patrick R. Folette (#34547)
Erin B. Rigsby (#37374)
Nicholas R. Varisco (#38431)
Edwin T. Murray (#38963)
One Galleria Boulevard, Suite 1100
Metairie LA 70001
Phone: (504) 833-5600
Fax: (504) 833-8080

c. **Attorneys for Ferguson Enterprises, Inc.**

LAWRENCE G. PUGH, III (#17351)
DONNA M. YOUNG (#20936)
1100 Poydras Street – Suite 3300
New Orleans, Louisiana  70163
Telephone:  (504) 799-4500
Facsimile:  (504) 799-4520

d. **Attorneys for J-M Manufacturing Company, Inc.**

**Kean Miller LLP**
Gregory M. Anding (#23622), Trial Attorney
Gayla M. Moncla (#19713)
Jay M. Jalenak, Jr. (#20234)
Karli G. Johnson (#26304)
Allison N. Benoit (#29087)
Alexandra E. Rossi (#35297)
Adrienne M. Wood (#38448)

FILED

2020 NOV 02 P 05:25
CIVIL
DISTRICT COURT

400 Convention Street, 7th Floor
P. O. Box 3513
Baton Rouge, LA 70821
Telephone: (225) 387-0999
Facsimile: (225) 388-9133
asbestos@keanmiller.com

AND

Janice M. Culotta (#23460)
Georgia N. Ainsworth (#35022)
909 Poydras Street, Suite 3600
New Orleans, Louisiana 70112
Telephone: (504) 585-3050

e. **Attorneys for Taylor-Seidenbach, Inc.**

C. Kelly Lightfoot
Edward S. Lassus
HAILEY, McNAMARA, HALL, LARMANN & PAPALE, LLP
Suite 1400, One Galleria Boulevard
P. O. Box 8288
Metairie, LA 70001-8288

f. **Attorneys for Turner Industries Group, LLC**

Cynthia C. Roth (La. Bar #25584)
Paul D. Palermo (La. Bar #19725)
BLUE WILLIAMS, L.L.P.
3421 North Causeway Boulevard
Suite 900
Metairie, LA 70002-3760
Telephone: (504) 831-4091
Facsimile: (504) 837-1182

3. **PARTIES:**

a. **Plaintiff**:

Brent Deaville

b. **Defendants:**

i. Exxon Mobil Corporation, Individually and as Successor in Interest to Standard Oil Company, Humble Oil Company, Humble Oil Co., and Esso Corp. ("Exxon")[1]

ii. Ferguson Enterprises, Inc. as alleged successor-in-interest to Louisiana Utility Supply Company ("LUSCO")

iii. J-M Manufacturing Company, Inc., Individually and as alleged[2] Alter Ego to J-M A/C Pipe Corporation ("J-MM")

iv. Taylor-Seidenbach, Inc..

v. Turner Industries Group, LLC (f/k/a Nichols Construction Company, LLC f/k/a Nichols Construction Corporation, f/k/a Turner Industries, LLC, f/k/a National Maintenance Holding Company, LLC f/k/a National Maintenance Corporation).

---

1 Exxon filed a venue exception in this case, which was stricken by the Court in an Order dated October 20, 2020. Exxon filed an application for supervisory writ with the Fourth Circuit Court of Appeal to review the October 20, 2020 ruling. As such, Exxon does not waive any rights related to venue by the instant filing.
2 JMM disputes Plaintiff's claims that it is the alter-ego to J-M A/C Pipe Corporation.

E-Filed

FILED

2020 NOV 02   P 05:25

CIVIL

DISTRICT COURT

## 4.   BRIEF SUMMARY OF MATERIAL FACTS:

### a.   Plaintiff

Plaintiff Brent Deaville contracted malignant mesothelioma on December 6, 2019 as a result of his exposure to asbestos fibers throughout his career between 1965 and 1988.

### Exposures at Exxon Mobil Refinery in Baton Rouge, Louisiana

Mr. Deaville worked as an insulator's helper for McCarty at Exxon's Baton Rouge refinery during the summer of approximately 1965 or 1967, where he was occupationally exposed to asbestos on a near-daily basis. Mr. Deaville worked as an insulation helper where he was in clouds of dust on a daily basis, for full days, with asbestos dust raining down on him from insulators working above him removing existing asbestos insulation and installing new asbestos insulation. On a daily basis, Mr. Deaville opened boxes of asbestos insulation (Thermobestos and Unibestos he mentioned specifically), handled the asbestos insulation, tied it to ropes, and watched as insulators above cut, fit, tied, and rasped the insulation on pipes. The asbestos insulation fell back down onto Mr. Deaville and he cleaned up the work area. Dust was visible when he handled the asbestos insulation, when he tied it, when it was lifted up, when pieces broke off, when it was cut, when it was rasped, when it was tied down, and when he cleaned it up. While working at Exxon, Exxon employees inspected ongoing pipe covering work, making sure the right pipes were being insulated and checking on the workers.  Exxon employees controlled the areas where Mr. Deaville worked, and were present while Mr. Deaville's work crew was working, ensuring that they were performing the work according to Exxon's standards.  Despite Exxon's knowledge of the hazards of asbestos, Mr. Deaville was never warned and was never provided any respiratory protection at Exxon.

Exxon specified asbestos-containing materials, including pipe covering, for use at its Baton Rouge facility. Exxon exercised tight control over contractors on its premises. Exxon purchased asbestos-containing materials directly, including asbestos-containing pipe covering. Exxon then furnished this material to contractors performing work on its premises. Exxon never completely released the care, custody or control of any of its units to contractors. Exxon's own documents acknowledge its awareness that, "essentially all high temperature insulation supplied before early 1973 contained asbestos."

### Exposures via Taylor-Seidenbach, Inc.

Taylor-Seidenbach, a Louisiana contractor, supplied and sold asbestos-containing building products and insulation during the time Mr. Deaville worked as an insulator's helper at Exxon's Baton Rouge refinery. These asbestos-products included, among others, Kaylo and Johns Manville pipe covering. Exxon's records show purchases of asbestos-containing building materials from Taylor-Seidenbach, and Mr. Deaville's employer at Exxon, McCarty Corporation, purchased asbestos containing Kaylo pipe covering from Taylor-Seidenbach.

### Exposures via Turner Industries f/k/a Nichols Construction Company LLC

Mr. Deaville worked for Nichols at Vulcan Chemical in Geismar, Louisiana ("Vulcan") in 1974 and continuing into 1975, for approximately six months as a mechanic through the Teamster's local. Mr. Deaville worked out of a temporary shop Nichols had on the job site where he replaced asbestos-containing clutches and brakes on the fleet of 50-100 Nichols vehicles. During this work, he sanded the surfaces of the new asbestos containing friction materials and utilized an air hose during this work blowing the asbestos dust from the brakes and clutches. Despite its knowledge regarding the hazards of asbestos, Nichols failed to provide Mr. Deaville any respiratory protection or warnings during this time.

### Exposures via J-M Manufacturing Company, Inc., Individually and as alleged Alter Ego to J-M A/C Pipe Corporation[3]

---

3 JMM disputes Plaintiff's claims that it is the alter-ego to J-M A/C Pipe Corporation

E-Filed

From 1983 until approximately 1988, while working for John F. Sanchez Plumbing, Mr. Deaville installed J-M Manufacturing Co., Inc.'s ("JMM") J-M asbestos-cement (A/C) transite pipe in water and sewer systems, cutting the J-M pipe with a gas-powered saw with a round blade and beveling the ends of the pipe with a grinder and a rasp. Cutting JMM pipe was necessary to tie the new JMM pipe into piping systems and to make connections into fittings. Between 1983 and 1990, Mr. Deaville cut and beveled JMM pipe in dusty work conditions 50-100 times.

Mr. Deaville, his co-workers, and employees from the pipe distributer all have testified that they never saw a warning about the hazards of asbestos on the JMM pipe, never saw anyone from JMM on the job sites when they was using JMM pipe. No one from JMM ever warned them about the hazards of asbestos. They never received any installation guides, MSDS or work practice guides for A/C pipe.

From the time it acquired John-Manville's ("Manville") A/C pipe business, JMM was fully aware that the products it made and sold caused serious disease, including mesothelioma. However, despite this knowledge, JMM continued to sell this A/C pipe until 1988, when, by JMM's own admissions, they stopped for the sole reason that it was no longer profitable.

JM A/C, a sister corporation and alleged alter-ego largely under the control of JMM, performed the actual manufacturing of the asbestos-cement pipe at facilities owned by JMM. JMM purchased the asbestos fiber, including the crocidolite, for the asbestos-cement pipe, supplied all clerical, accounting, human resources, and plant safety services for JM A/C, and JMM marketed, sold, and distributed the asbestos cement pipe made by JM A/C. JMM, aware that there is no safe level of exposure, advised that all of its plant workers should wear respirators at all times regardless of exposure levels. They did not pass this advice on to end users like Mr. Deaville.

JMM knew that it was necessary for end users in the field to cut and bevel the A/C pipe that it sold and that abrasive power saws were used in the field. JMM also knew there was risk of exposure associated with cutting and beveling its pipe, regardless of the tool or method used. Despite its continual claim that A/C pipe is safe, JMM never tested the levels of exposure in the field from unloading, handling, cutting, or beveling its A/C pipe.

There were multiple asbestos air sampling surveys between 1983 and 1988 at both of JMM's asbestos-cement pipe manufacturing plants that consistently found the highest level of sampled exposure occurred during the sawing operations (both wet sawing and dry), from simply handling the pipe – handling and stacking the couplings, "banging of the pipes producing a disruption of the loose fiber dusts," during the use of hand held rasps (files) and brushing off by hand or blowing off the residue resulting in airborne asbestos fiber. These surveys found that "during loading and unloading of the cut Transite material, dust was generated." The surveys found when the couplings were wet, transferring them from pallets to the testing unit created dust and found exposures resulting from handling the finished product. These high counts were found even when J-MM used a vacuum system to pull the dust from the air. The recommendations presented to J-MM in the summaries of these surveys were that "dry filing and sanding procedures should be discontinued, as fiber release has been demonstrated by this activity." These surveys report that cutting the pipe released asbestos dust in excess of the proposed OSHA standards and recommended that employees sawing the finished pipe should wear a respirator.

However, JMM did not inform customers and users that merely handling or wiping their hand across a finished piece of Transite pipe may expose them to injurious levels of airborne asbestos, nor did JMM pass along this recommendation to workers such as Mr. Deaville who handled, moved, and beveled pipe and couplings should wear respirators

E-Filed

**Exposures via Ferguson Enterprises, Inc. doing business as Louisiana Utility Supply Company, a Ferguson Subsidiary**

Mr. Deaville worked as a plumber from 1979 until 1988, where he installed and tied in Johns-Manville and J-M Manufacturing asbestos cement transite pipe many times on commercial jobs throughout Baton Rouge, Louisiana. This asbestos cement transite pipe was supplied and delivered to the job sites on which Mr. Deaville worked by Louisiana Utility Supply Company ("LUSCO"). LUSCO was a major distributor in Baton Rouge for J-MM's asbestos cement pipe, purchasing hundreds of tons of asbestos cement pipe during the years that Mr. Deaville worked with these products as a plumber. The evidence will show that Ferguson Enterprises, Inc. ("Ferguson") is a successor, for liability purposes, of LUSCO.

**b.  Exxon Mobil Corporation**

A preponderance of the evidence does not show that Exxon was a substantial factor in causing Mr. Deaville's illness. A preponderance of the evidence does not show that Exxon breached any applicable standard of care to Mr. Deaville.

Mr. Deaville testified that he worked at the Exxon refinery in Baton Rouge for three months during the summer of 1965 at the Pipe Still No. 10 unit while employed by either Anco Insulations, Inc. ("Anco") or The McCarty Corporation ("McCarty"). Mr. Deaville never identified or recalled working at any other area in the Exxon Baton Rouge Refinery. The Pipe Still No. 10 unit at the Exxon Baton Rouge refinery was constructed originally in the early 1950's. Exxon business records do not show any construction projects or turnarounds occurring at the Pipe Still No. 10 unit in the summer of 1965.

The certified social security earning statement received on the morning of October 29, 2020shows that Brent Deaville was never employed by Exxon. The records show that Mr. Deaville was employed only by McCarty in the second quarter of 1967. A $7 million major new construction expansion project at Exxon Rouge Refinery's No. 10 Pipe Still unit commenced in 1966 and was completed in June of 1967, with a tie in of the expansion to the existing unit. Physical improvements made to the No. 10 Unit included modification of its two distillation towers and allied equipment and the addition of a third distillation tower, two new furnaces and a new desalter. A considerable amount of the work was done offsite. Completion of the project almost doubled the processing capacity of the No. 10 unit from 85,000 barrels a day to 160,000 barrels a day.

Mr. Deaville could not recall whether his employer was working as a contractor or a sub-contractor at the Baton Rouge refinery. Plant Service Construction Co. was the general construction contractor that performed and supervised the construction work on the Pipe Still No. 10 expansion project in 1966 through 1967. Plant Services Construction Co. issued a sub-contract to McCarty to perform insulation work for and supply materials to Plant Service Construction Co. at Pipe Still No. 10. Materials that McCarty used at Pipe Still No. 10 or supplied at Pipe Still No. 10, including those used or supplied during the time that Mr. Deaville was allegedly performing work for McCarty, were sold by McCarty to Plant Service Construction Co. and were owned by Plant Service Construction Co. at the time that they were transported to and/or installed at Pipe Still No. 10. McCarty billed Plant Service Construction Co. on a cost plus basis. Invoices from Plant Services Construction Co. to McCarty related to Pipe Still No. 10 extended into June of 1967.

Plant Services Construction Co. was issued a contract as an independent contractor of Exxon. In its contract with Plant Services Construction Co., Exxon did not retain any control or right of control to directly supervise the details, means or methods of work performed by Plant Services Construction Co. or its sub-contractors.[4]  Exxon did not employ Brent Deaville or direct the means or methods of his work.

According to the Social Security Administration, Mr. Deaville's total compensation he received while working for McCarty was $397.30. McCarty's records, during the timeframe when Mr. Deaville allegedly performed work at Pipe Still No. 10, indicate that the

---

FILED

2020 NOV 02  P 05:25

CIVIL
DISTRICT COURT

lowest paid McCarty employees at that job were apprentice insulators who earned $3.22 per hour. Based on this information, assuming Mr. Deaville was not paid higher than $3.22 per hour, Mr. Deaville worked approximately 123 hours for McCarty, less than one month's worth of work. Mr. Deaville's work at Exxon's refinery, if any, occurred in the course and scope of employment by a sub-contractor of Plant Services Construction Co. Any materials he handled were either the property of McCarty or Plant Services Construction Co.

### c. Ferguson Enterprises, Inc.

Brent Deaville filed suit in January 2020 alleging that he had been diagnosed with mesothelioma caused by asbestos exposure during his employment with various companies from the 1960's through the 1990's. As to Ferguson, Plaintiff alleges that his work as a plumber for Sanchez Plumbing (later J&J Mechanical) involved the installation, repair, and removal of underground water and sewerage pipes, many of which allegedly contained asbestos materials. Plaintiff specifically alleges that as a result of his plumbing work, he was exposed to respirable asbestos fibers from asbestos cement pipe ("AC pipe") when those pipes were cut to size and shape. Plaintiff alleges that Louisiana Utility Supply Company ("LUSCO") supplied asbestos cement pipe ("AC pipe") manufactured by defendant, JM Manufacturing to which he was exposed. Plaintiff further alleges that LUSCO is a subsidiary of Ferguson, and by implication, that Ferguson is liable for LUSCO's former liabilities.

LUSCO was a utilities supply business which supplies materials to contractors engaged in the installation and construction of these systems. It was incorporated in 1972 but did not begin operations from its main office in Baton Rouge until 1976. Ferguson and LUSCO were completely different and unrelated entities, and Ferguson did not later assume or acquire the tort liabilities of LUSCO.

Ferguson denies that LUSCO ever sold any ac pipe to Sanchez Plumbing, plaintiff's employer. LUSCO further denies that any products sold by LUSCO to Sanchez Plumbing were not a substantial contributing cause of Plaintiff's mesothelioma.

### d. J-M Manufacturing Company, Inc.

J-M Manufacturing Company, Inc. ("J-MM") has never manufactured any asbestos-containing products. For a brief period, from 1983 to 1988, J-MM distributed, asbestos-cement pipe ("ACP") manufactured by J-M A/C Pipe Corporation. ACP is an encapsulated product, only rendered "unsafe" when an individual plaintiff breaks the encapsulation and frees the asbestos by illegally and improperly using an unventilated power saw to cut the pipe, putting the asbestos into a breathable form. The ACP supplied by J-MM was safe and legal when distributed and remains safe and legal today. To this day, ACP continues to transport clean water, drain water, and sewerage for communities throughout the United States.

By 1983, when J-MM first supplied ACP and Mr. Deaville alleges he first encountered ACP supplied by J-MM, it was well-known among ACP contractors, such as plumbers and pipefitters, and ACP distributors that dry cutting ACP using an unventilated power-saw was an unsafe work practice and posed a health hazard to installers. OSHA had been in effect for over 10 years, and other ACP manufacturers, as well as industry and trade groups, had been providing information on "safe" work practices for over five years. Despite a reasonable expectation (based on OSHA and industry standards, customs and practices, including those adopted by Louisiana) that end users of ACP were, by 1983, observing safe work practices, J-MM independently issued warnings with respect to safe work practices, including, inter alia: (1)distributing ACP with warning on the pipe; (2) providing Material Safety Data Sheets ("MSDS"); and (3) disseminating pipe installation guides that clearly detailed both proper, and improper, work practices.

Mr. Deaville testified that he installed "J-M" "transite" pipe, among others, while working as a plumber for John F. Sanchez Plumbing and/or J and J Mechanical Inc. (collectively "Sanchez Plumbing") from approximately 1979-1990 at various unidentified locations in the Baton Rouge, Louisiana area. Mr. Deaville's own use of ACP in this case rendered an otherwise safe and legal product "unsafe" when he illegally and improperly

*Deaville v. Amox Insulation, Inc., et al.*                          No. 2020-00041

FILED

2020 NOV 02  P 05:25

CIVIL
DISTRICT COURT

allegedly cut it with an unventilated power saw. Mr. Deaville testified that he worked with three (3) brands of ACP: Johns-Manville, CertainTeed, and, beginning in approximately 1983 or 1984, "J-M." Mr. Deaville testified that while working for Sanchez Plumbing, he installed sewer and water pipes, drainage systems, fire hydrants, and plumbing fixtures. In addition to ACP, he used copper pipe, PVC pipe, cast iron pipe, and ductile iron pipe. Although Mr. Deaville claims to have worked with "J-M" ACP, he could not identify a single location where he specifically recalled using "J-M" ACP. And this is despite the fact that he lived and worked nearly his entire career in Baton Rouge.

Mr. Deaville's co-worker, Gerald Terrell, similarly could not place "J-M" ACP at a single job site in Baton Rouge. He also estimated that only 8-9% of the jobs they performed for Sanchez Plumbing involved ACP. John F. Sanchez, Jr., who worked for John F. Sanchez Plumbing from 1978-1986 (and was the son of the owner of the company), and owned and operated J and J Mechanical Inc. from 1987 to present day, testified that he was personally involved with ordering materials, and bidding jobs for both companies. He had no knowledge of either company ever purchasing ACP or its employees ever working with ACP. Mr. Sanchez also testified that the tie-in work described by Mr. Deaville would have been performed by the Baton Rouge Water Company or by the City of Baton Rouge. Similarly, the LUSCO salesman, Bob Haley, who had the Sanchez Plumbing account for all years that Mr. Deaville worked for Sanchez testified that he never sold ACP to Sanchez Plumbing. He also testified that tie-ins could be done without cutting pipe. Mr. Haley further testified that he began telling plumbing contractors in the 1970s not to use a power saw when cutting ACP.

Mr. Deaville did not suffer any exposures from the proper use of products attributable to J-MM, if any. Rather, any injury-causing exposures were the result of the actions/omissions of Mr. Deaville and his employer.

Given the industry knowledge and the wide dissemination of proper work practices and warnings against improper work practices, and the fact that ACP was sold by other companies years after J-MM ceased supply of ACP, J-MM's conduct does not amount to wanton or reckless disregard for public safety. More importantly, Mr. Deaville's alleged exposure did not occur as a result of any transportation, storage, or handing of ACP by J-MM. Finally, ACP in and of itself is not "toxic or hazardous". It does not potentially become so until it is illegally and improperly cut with an unventilated power saw.

### e.  Taylor-Seidenbach, Inc.

Taylor-Seidenbach, Inc. denies that plaintiff, Brent Deaville's injuries resulted from exposure to any asbestos-containing products sold or used by Taylor-Seidenbach, Inc.

Taylor-Seidenbach, Inc. submits that if Brent Deaville sustained lung damage due to exposure to asbestos-containing products, it was caused by exposure to asbestos-containing products manufactured and sold and/or used by other defendants for whom Taylor-Seidenbach, Inc. is not responsible.

Taylor-Seidenbach, Inc. specifically denies selling and/or distributing asbestos-containing materials to which Brent Deaville was exposed while working at the work sites identified in the Petition for Damages.

### f.  Turner Industries Group, LLC

Brent Deaville has asserted that he contracted mesothelioma as a result of occupational exposures to asbestos. Turner Industries Group, successor to Nichols Construction Company and National Maintenance Corporation, was named in the Petition for Damages as employer defendant. Mr. Deaville has pled that he was exposed to asbestos in connection with his work as a contractor and laborer from approximately 1964 through 1979, as a mechanic and mechanic's helper from approximately 1964 through 1979, and as a plumber from 1979 through 1990. Turner, in its Answer and Affirmative Defenses to the Petition for Damages, has asserted that all of Mr. Deaville's employment-related claims against Turner are barred by the Louisiana Workers' Compensation Act ("LWCA") and its amendments. The Itemized Social Security Earnings Statement indicates that Mr. Deaville

was first employed by Turner's predecessor, Nichols, in the fourth quarter of 1975, after the September 1, 1975 amendment to the LWCA which included mesothelioma as a covered occupational disease under the Act.

According to Mr. Deaville, he worked for several contractors out of the Teamster's Union from 1974 to 1976. Mr. Deaville testified that his last job as a Teamster was working for Nichols as an auto mechanic at Vulcan Chemical in Geismar, La. He and his supervisor / coworker, James Bowlin, worked in a temporary mechanic shop erected on Vulcan's premises where they performed maintenance on Nichols' fleet of vehicles. Mr. Bowlin is deceased and no others worked with them in the mechanic shop at Vulcan. Mr. Deaville testified that this job lasted several months. Importantly, Mr. Deaville testified that he had no information to suggest that anyone from Nichols intended for him to develop an asbestos related disease.

Mr. Deaville's testimony regarding his work for Nichols, as corroborated by the Itemized Social Security Earnings Statement, shows that he was employed by Nichols after September 1, 1975. Because there is no evidence that Nichols committed an intentional tort, Turner, as Mr. Deaville's post-September 1, 1975 employer, is immune for Mr. Deaville's tort claims which arise out of his employment with Nichols.

Finally, any exposure which Mr. Deaville may have received when working for Nichols as an auto mechanic was not a substantial contributing cause of Plaintiff's mesothelioma.

## 5.   UNCONTESTED MATERIAL FACT

a.   McCarty Corporation had a maintenance contract at Exxon's Baton Rouge refinery during the time Mr. Deaville worked there.

b.   Anco had a maintenance contract at Exxon's Baton Rouge refinery during the time Mr. Deaville worked there.

c.   JMM distributed the asbestos cement pipe made by JM A/C between 1983 and 1988.

d.   JM A/C manufactured the asbestos-cement pipe at facilities owned by JMM?

e.   JMM purchased the asbestos fiber, including crocidolite, for the asbestos-cement pipe manufactured by JM A/C between 1983 and 1988.?

f.   A/C pipe manufactured by JM A/C contained both crocidolite and chrysotile between 1983 and 1988?

g.   Mr. Deaville performed brake and clutch replacements and was exposed to asbestos from the American Brakeblok asbestos brakes, EIS asbestos brakes, Bendix asbestos brakes and Borg Warner asbestos clutches during the summers of 1966, 1967 and 1968.

h.   Mr. Deaville was exposed to asbestos while installing and removing "Blue African Asbestos Gaskets" at the Shell Geismar facility for 6 months in 1978.

i.   Mr. Deaville worked as a plumber for John F. Sanchez Plumbing ("Sanchez Plumbing") from 1979-until 1989 and for J & J Mechanical Inc. from 1989 until 1990 at various commercial locations in the Baton Rouge, Louisiana area, installing sewer and water pipes, drainage systems, fire hydrants, and plumbing fixtures.

j.   Mr. Deaville was a member of the Teamsters' union during the years of 1974, 1975 and 1976.

k.   As a Teamster, Mr. Deaville worked as a driver making deliveries, worked as a warehouseman, and worked as a mechanic.

FILED

2020 NOV 02  P 05:25

CIVIL
DISTRICT COURT

l.  Mr. Deaville's first classification with the Teamsters' union was as a driver making deliveries. As a Teamster, he worked as a delivery driver out of the Teamsters' union for Bigelow-Liptak, a subsidiary of A.P. Green, for a couple of years, delivering rubber lined pipe.

m.  Mr. Deaville testified that his second classification with the Teamsters' union was as a warehouseman.

n.  Mr. Deaville worked as a warehouseman out of the Teamsters' union for Buquet and Leblanc at Ceiba Geigy for approximately two months.

o.  Finally, Mr. Deaville's last classification with the Teamsters' union was as a mechanic.

p.  Mr. Deaville's last job out of the Teamsters' union was working as a mechanic for Nichols Construction at Vulcan Chemical.

q.  Mr. Deaville's certified social security earnings statement indicates that Mr. Deaville first began working for Nichols Construction in the fourth quarter of 1975.

## 6.  CONTESTED ISSUES OF FACT:

a.  Whether Brent Deaville was diagnosed on or around December 6, 2019 with malignant mesothelioma?

b.  Whether Brent Deaville's mesothelioma was caused by his exposure to asbestos?

c.  Whether Brent Deaville worked as an insulators' helper for a contractor at Exxon refinery in Baton Rouge, Louisiana for at least part of summer in 1965 or 1967?

d.  Whether Exxon Mobil Corporation ("Exxon") owned and operated the Exxon Refinery in Baton Rouge when Mr. Deaville worked there?

e.  Whether Exxon specified asbestos containing materials, including Unibestos pipe covering, for use at its Baton Rouge refinery during the time Mr. Deaville worked there?

f.  Whether Exxon purchased asbestos-containing materials including pipe covering, for use at its Baton Rouge refinery during the time Mr. Deaville worked there?

g.  Whether asbestos-containing insulating products have been present in Exxon's Baton Rouge refinery during the period 1935-1980?

h.  Whether in 1937, Roy Bonsib, Exxon's Chief Safety Inspector identified asbestos insulation as a health hazards and described control measures to eliminate or minimize asbestos exposures?

i.  Whether by 1949, Exxon knew that asbestos could cause cancer?

j.  Whether by 1964, Exxon Baton Rouge was aware that insulators were exposed to asbestos from hand sawing asbestos containing pipe covering, from applying asbestos materials, and from removing old insulation that was likely to "produce dry dust exposures?"

k.  Whether Mr. Deaville was exposed to asbestos while working at Exxon's Baton Rouge Refinery?

l.  Whether Mr. Deaville's exposure to asbestos while working at Exxon was a substantial factor in causing his mesothelioma?

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL
DISTRICT COURT

m. Whether Exxon was responsible for making contractors on its premises aware of safety hazards?

n. Whether Exxon retained control over contractors' work?

o. Whether Exxon expressly or impliedly approved unsafe work practices by contractors on its premises?

p. Whether Exxon had custody, care, or control of the asbestos-insulation within its plant which caused injury to Mr. Deaville?

q. Whether the asbestos insulation at Exxon's refinery was unreasonably dangerous?

r. Whether Exxon failed to disclose critical medical and safety information to Mr. Deaville regarding asbestos hazards in general and with regard to those specific hazards at Exxon's premises?

s. Whether Defendants used safe and sound principles and practices in their own involving the use and storage of asbestos and/or asbestos-containing materials?

t. Whether Defendants failed to provide adequate warnings, safety equipment, ventilation, and/or respiratory protection to Mr. Deaville?

u. Whether Defendants failed to measure the levels of asbestos dust with respect to the foreseeable work Mr. Deaville performed?

v. Whether Defendants complied with applicable state and federal regulations regulating exposure to asbestos?

w. Whether LUSCO was in the business of selling and distributing A/C pipe?

x. Whether LUSCO and JMM failed to adequately warn Mr. Deaville of the hazards associated with handling A/C pipe?

y. Whether the agreements made to transfer LUSCO to its successor corporations, LUS-ACQ/Clayton ("LUS-ACQ") and then to Ferguson assumed the liabilities of LUSCO, either expressly or impliedly?

z. Whether LUSCO's sale to LUS-ACQ (and later Ferguson) transferred the whole of the business, including not only LUSCO's inventory and equipment but all of its ongoing business operations, including the liabilities thereof?[5]

aa. Whether the agreement intended the transfer of the entire business of LUSCO to LUS-ACQ?

bb. Whether the purchase agreement between LUSCO and LUS-ACQ (and later Ferguson) specifically excludes from the purchase any liability related to products liability or tort claims?

cc. Whether LUS-ACQ was set up as a "mere continuation" of LUSCO?

dd. Whether the agreements made to transfer LUSCO to its successor corporations, LUS-ACQ/Clayton ("ACQ") and Ferguson were made to insulate these successors from liability?[6]

ee. Whether LUSCO was aware of the risk of liability arising out of its sale and distribution of asbestos-containing materials at the time of the purchase agreement?

---

[5] Ferguson contends this is an issue of law, not fact.
[6] Ferguson contends this is an issue of law, not fact.

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

ff.  Whether LUSCO avoided risk of liability of the long-latency asbestos exposure by selling its business before suit was filed?

gg. Whether Ferguson had substantial overlap in employees and supervisory personnel with LUSCO?

hh. Whether Ferguson had the same production facility in the same physical location as LUSCO?

ii.  Whether Ferguson sold and distributed the same products as LUSCO?

jj.  Whether Ferguson retained the same name, assets, general business operations, and has held itself out as the continuation of the LUSCO?

kk. Whether Ferguson has held itself out to the public as the same entity as LUSCO?

ll.  Whether LUSCO and its owner-shareholder agreement to indemnify LUS-ACQ for any claims and liabilities not reflected on the Closing Balance Sheet for a period of 2 years transferred those liabilities back to LUS-ACQ at the conclusion of the indemnification period?

mm.     Whether January 1, 1983, JMM purchased John-Manville's pipe division, including all plants and networks to make and sell A/C pipe?[7]

nn. Whether JMM knew of the hazards of asbestos from the time of its inception in 1983?

oo. Whether 1990, JMM lost or misplaced two and a half truckloads of business records shipped from its Stockton facility to New Jersey.

pp. Whether JMM disposed of several pallets of accounts payable documents in 1993.

qq. Whether JMM was aware that A/C pipe it sold, marketed, and distributed was cut and beveled in the field during installation.

rr.  Whether JMM ever conducted any testing to determine quantity of airborne asbestos when the A/C pipe it sold, marketed, and distributed was cut, beveled, unloaded, or handled?

ss.  Whether JMM supplied all clerical, accounting, human resources, and plant safety services for JM A/C between 1983 and 1988?

tt.  Whether JMM supervised JM A/C employees between 1983 and 1988?

uu. Whether JMM was in charge of safety at facilities where JM A/C manufactured A/C pipe between 1983 and 1988?

vv. Whether JMM was responsible for safety over the A/C pipe production lines where JM A/C manufactured A/C pipe between 1983 and 1988?

ww.     Whether JMM was aware that there is no safe level of asbestos?

xx. Whether JMM was responsible for asbestos monitoring at facilities where JM A/C manufactured A/C pipe between 1983 and 1988?

yy. Whether JMM reviewed the employee candidates to work in the A/C pipe production lines where JM A/C manufactured A/C pipe between 1983 and 1988?

---

[7] JMM notes its contention that Uncontested Facts mm-uuu are arguments of counsel and Plaintiff's narrative and many are not issues of fact

FILED

2020 NOV 02  P 05:25

CIVIL
DISTRICT COURT

zz. Whether JMM supervised the quality control of A/C pipe production lines where JM A/C manufactured A/C pipe between 1983 and 1988?

aaa.    Whether the maintenance supervisor for JMM was in charge of maintenance on both the A/C and PVC production lines between 1983 and 1988?

bbb.    Whether a JMM employee handled payroll for JM A/C employees working on the A/C pipe production line between 1983 and 1988?

ccc.    Whether JMM handled accounts payable for JM A/C A/C pipe division between 1983 and 1988?

ddd.    Whether JMM's employees sold A/C pipe manufactured by JM A/C between 1983 and 1988?

eee.    Whether JMM's shipping department handled the shipping of A/C pipe manufactured by JM A/C between 1983 and 1988?

fff. Whether JMM paid trucking and/or transportation companies to carry A/C pipe by JM A/C between 1983 and 1988?

ggg.    Whether JM A/C had separate headquarters from JMM between 1983 and 1988?

hhh.    Whether during the time JM A/C manufactured and JMM sold, and/or distributed A/C pipe, JMM was notified of workers compensation claims for asbestos-related personal injuries filed against JMM?

iii. Whether JMM was aware that end users handling A/C pipe could result in exposure to asbestos?

jjj. Whether JMM was aware that crocidolite asbestos was more potent than other asbestos fiber types?

kkk.    Whether asbestos is a toxic substance?

lll. Whether JMM stored the A/C pipe manufactured by JM A/C between 1983 and 1988?

mmm.    Whether the results of asbestos air sampling surveys performed between 1983 and 1988 at JMM's Stockton and Denison plants disprove JMM's current position that its pipe is safe unless cut and beveled with gas powered abrasive saws?

nnn.    Whether the results of asbestos air sampling surveys performed between 1983 and 1988 at JMM's Stockton and Denison plants put JMM on notice that the highest airborne asbestos concentrations in the wet and dry sawing operations, from handling and stacking the A/C pipe and couplings, from "banging of the pipes producing a disruption of the loose fiber dusts," from the use of hand held rasps (files), from brushing off by hand or blowing off the residue, during loading and unloading of the cut transite material, from transferring wet couplings from pallets to the testing unit, and from handling the finished product?

ooo.    Whether the asbestos air sampling surveys were done while JMM used a vacuum system to pull the dust from the air?

ppp.    Whether the recommendations presented to JMM in the summaries of these air sampling surveys state that "dry filing and sanding procedures should be discontinued, as fiber release has been demonstrated by this activity?"

qqq.    Whether JMM air sampling surveys reported that cutting the pipe released asbestos dust in excess of the proposed OSHA standards and recommended that employees sawing the finished pipe should wear a respirator?

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

rrr. Whether JMM ever recommended that end users, such as Mr. Deaville wear a respirator?

sss. Whether JMM failed to distribute MSDS for A/C pipe it distributed, sold and/or marketed to end users such as Mr. Deaville and his employer?[8]

ttt. Whether JMM failed to ensure that A/C pipe it distributed, sold and/or marketed was safely handled, stored, and/or transported?[9]

uuu.       Whether Mr. Deaville was exposed to asbestos from A/C pipe products distributed, marketed and/or sold by JMM and manufactured by J-M A/C?

vvv.       Whether Mr. Deaville's exposure to by J-M Manufacturing Company, Inc. was a substantial contributing factor in causing his mesothelioma?[10]

www.       Whether JMM had asbestos cement pipe in its custody?[11]

xxx.       Whether LUSCO sold asbestos-cement pipe during the time Mr. Deaville worked as a plumber?

yyy.       Whether LUSCO had asbestos cement pipe in its custody?

zzz.       Whether the asbestos-cement pipe posed an unreasonable risk of harm?

aaaa.      Whether LUSCO purchased pipe from JMM?

bbbb.      Whether LUSCO distributed JMM A/C pipe to Mr. Deaville's job sites?

cccc.      Whether any hazard communication related to asbestos actually accompanied asbestos cement pipe products distributed and sold by J-MM?[12]

dddd.      Whether any Material Safety Data Sheets related to the hazards of asbestos in asbestos-containing materials manufactured by J-M A/C and distributed, marketed and sold by J-MM were ever provided to Mr. Deaville or his former employers?[13]

eeee.      Whether Plaintiff Brent Deaville's former employers knew of the hazards of asbestos-cement materials distributed and sold by J-MM?

ffff.      Whether J-MM acted with a wanton and reckless disregard for public safety in the storage, handling and transportation of asbestos-cement pipe products?

gggg.      Whether J-MM knew of the unreasonably high risk of mesothelioma and asbestos diseases posed by its products before marketing, distributing and/or selling the products manufactured by J-M A/C, yet purposely proceeded with such action?[14]

hhhh.      Whether JMM affirmatively minimized the risk of mesothelioma and asbestos related diseases and the hazardous and toxic nature of asbestos through marketing and

---

8 JMM contends that it had no duty to provide MSDS to persons or companies that didn't purchase A/C pipe. JMM asserts the question is whether JMM provided MSDS to purchasers, and therefore this is not a material fact – contested or uncontested.

9 JMM contends that no such duty exists, and therefore this is not a material fact contested or uncontested.

10 JMM contends that this is not a factual issue.

11 JMM contends that the only material question of fact is whether JMM had the ACP that Mr. Deaville was allegedly exposed to in its possession when Mr. Deaville was allegedly exposed to it. Thus, as stated, it is not a material issue.

12 JMM asserts that this should read improper handling of A/C pipe, which Plaintiff disputes.

13 JMM asserts there is no duty on JMM to prove or provide such as it states Mr. Deaville and his employer were not customers, and thus, this is not a material fact.

14 JMM asserts this should read – Whether there is a risk of mesothelioma and asbestos diseases posed by the proper handling of asbestos cement pipe, and if so, whether JMM knew of such before marketing, distributing and/or selling the products, yet purposely proceeded with such action.

**FILED**

2020 NOV 02   P 05:25

CIVIL

DISTRICT COURT

promotional efforts and product labeling?[15]

iiii. Whether JMM disregarded a high and excessive degree of danger known to JMM or that would have been apparent to a reasonable person in JMM's position?[16]

jjjj. Whether the danger created by JMM's wanton and reckless conduct threatened or endangered public safety?[17]

kkkk.    Whether the A/C pipe products was hazardous or toxic substances?

llll. Whether JMM's wanton and reckless conduct, if any, and disregard for public safety in storage, handling and/or transportation of A/C pipe, if any, to which Mr. Deaville was allegedly exposed was a substantial factor in causing his mesothelioma?[18]

mmmm.    Whether Mr. Deaville was exposed to asbestos from asbestos products distributed or delivered by LUSCO?

nnnn.    Whether Mr. Deaville's exposure to asbestos by LUSCO was a substantial contributing factor in causing his mesothelioma?

oooo.    Whether Mr. Deaville is entitled for damages for past and future pain; past and mental anguish and mental suffering; past and future physical disability; past and future physical disability; past and future loss of enjoyment of life; and past and future medical expenses?

pppp.    Whether it was common practice for installers to cut A/C pipe in the field with a power tool?

qqqq.    Whether JMM was aware that power saws were used during the installation of A/C pipe?[19]

rrrr.    Whether dust was created any time A/C pipe was cut or beveled?[20]

ssss.    Whether as part of the sale, and distribution of A/C pipe products and J-M A/C's manufacture of A/C pipe products, JMM handled asbestos?[21]

tttt. Whether as part of the sale, and distribution of A/C pipe products and J-M A/C's manufacture of A/C pipe products, JMM stored asbestos?[22]

uuuu.    Whether as part of the sale, and distribution of A/C pipe products and J-M A/C's manufacture of A/C pipe products, JMM transported asbestos?[23]

vvvv.    Whether JMM, together with JM A/C combined their property, skill, or knowledge with the intent to carry out a single business undertaking of manufacturing and marketing asbestos containing products?[24]

---

15 JMM asserts that Mr. Deaville improperly handled A/C pipe, and as such that statement should read; " Whether JMM affirmatively minimized the risk of mesothelioma and asbestos-related diseases, IF ANY, and the hazardous and toxic nature of asbestos CEMENT PIPE WHEN IMPROPERLY HANDLED through marketing and promotional efforts? (JMM did not label the product because it was not its product).

16 JMM asserts this question should read, "Whether asbestos cement pipe when properly handled poses a high and excessive degree of danger, and if so, whether JMM disregarded his high and excessive degree of danger knowingly or that would have been apparent to reasonable persons in JMM's position?"

17 JMM contests Plaintiff's presentation of this fact and asserts it should be written, "Whether Mr. Deaville was harmed by JMM's wanton and reckless conduct?"

18 JMM asserts that this is not a factual issue.

19 JMM asserts, "this is not material. "

20 JMM asserts, "Not material.  The material issue is whether Mr. Deaville sustained exposure to asbestos that substantially contributed to his meso."

21 JMM asserts, "The question is whether the handling, storage and transportation is what caused his damages. This is an incorrect statement of law and is not a material issue of fact."

22 *See* Footnote 21.

23 *See* Footnote 21.

24 JMM asserts, "Incorrect statement of law and not a relevant factual issue."

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

wwww.   Whether JMM and JM A/C each had an ownership interest in the business enterprise?[25]

xxxx.   Whether JMM and JM A/C each had joint control and/or delegated control over the business enterprise?[26]

yyyy.   Whether JMM and JM A/C each agreed to share the profits and losses of the business enterprise?[27]

zzzz.   Whether JMM issued cautionary statements regarding asbestos in A/C pipe it sold and/or distributed to any entity in Baton Rouge, Louisiana between 1983 and 1988?

aaaaa.   Whether JMM provided cautionary statements regarding asbestos in A/C pipe it sold and/or distributed to LUSCO between 1983 and 1988?

bbbbb.   Whether Mr. Deaville was exposed to asbestos attributable to Taylor-Seidenbach?

ccccc.   Whether Mr. Deaville's exposure to asbestos by Taylor-Seidenbach was a substantial contributing factor in causing his mesothelioma?

ddddd.   Whether Mr. Deaville's exposure to asbestos while working for Turner (Nichols) was a substantial contributing factor in causing his mesothelioma?

eeeee.   Whether Plaintiff was exposed to asbestos while working as a mechanic for Turner (Nichols) at Vulcan Chemical in Geismar, Louisiana?

fffff.   Whether Exxon owed a legal duty to Mr. Deaville as the employee of a subcontractor whose alleged injury occurred in the course and scope of work and as a hazard inherent to the work performed by his employer sub-contractor?

ggggg.   Whether Exxon breached any standard of care applicable in the mid to late 1960's to Mr. Deaville as the employee of a sub-contractor at Exxon?

hhhhh.   Whether Exxon exercised a right of control over the details, means and methods of Mr. Deaville's work?

iiiii.   Whether Mr. Deaville was an invitee of Exxon?

jjjjj.   Whether Mr. Deaville's alleged exposure to asbestos was a latent or hidden?

kkkkk.   What extent and amount of compensatory damages, if any, are supported by the evidence in this case?

lllll.   Whether fault and legal responsibility should be allocated to the parties with whom plaintiff has settled his claims for damages related to his asbestos related disease?

mmmmm. Factual questions implicit in or raised by the disputed issues of law.

nnnnn.   Whether any alleged exposure to airborne asbestos (if any) through working with ACP supplied by J-MM (if any) was "frequent and regular" so as to constitute a substantial contributing factor of the disease?

---

25 *See* Footnote 24.
26 *See* Footnote 24.
27 *See* Footnote 24.

ooooo.     Whether Mr. Deaville failed to exercise due care for his own safety and is therefore contributorily negligent by allegedly cutting ACP with an unventilated power saw and without taking precautions while allegedly doing so?

ppppp.     Whether Mr. Deaville's employers failed to exercise due care for their employees' safety as mandated by OSHA and industry practices, and as such, whether this constitutes an intervening and superceding cause of Mr. Deaville's alleged injuries?

qqqqq.     Whether Mr. Deaville worked with ACP supplied by J-M while employed by Sanchez, and, if so, whether Sanchez was a sophisticated user based on the information it knew or should have known as a professional plumbing contractor, specializing in the installation of underground piping systems?

rrrrr.     Whether LUSCO sold any asbestos cement pipe to Sanchez Plumbing and/or J&J Mechanical?

sssss.     Whether the Plaintiff ever worked with A/C pipe on any job(s) while employed by Sanchez Plumbing or J&J Mechanical?

ttttt.     Whether Sanchez Plumbing or J&J Mechanical ever purchased any A/C pipe from LUSCO?

uuuuu.     Whether any sale of asbestos cement pipe from LUSCO to Sanchez Plumbing was a substantial contributing cause of Mr. Deaville's mesothelioma?

vvvvv.     The fault of other parties including Mr. Deaville's employers?

wwwww.    Set-offs for settled parties?

xxxxx.     Whether Brent Deaville was exposed to any products sold or used by Taylor-Seidenbach, Inc.?

yyyyy.     Whether Taylor-Seidenbach, Inc. knew or should have known of the health hazards associated with exposure to asbestos prior to or during Brent Deaville's employment?

zzzzz.     The nature and extent of the injuries allegedly sustained by Mr. Deaville?

aaaaaa.    The causal relationship, if any, between Brent Deaville's exposure to asbestos and other harmful dust(s) and his injuries?

bbbbbb.    Quantum and Mitigation of Damages?

## 7.    **CONTESTED ISSUES OF LAW:**

a.  Any issue of law inherent in the disputed issues of fact.

b.  Those implicit in the contested issues of fact above and contained in the petitions, answers, and defenses of the parties

c.  Whether Defendant Exxon Mobil Corporation ("Exxon"), as a premises owner, owed a duty of reasonable care for the safety of Mr. Deaville, who was exposed to asbestos at Defendant's facilities in Baton Rouge, Louisiana, to ensure him a safe working environment?

d.  Whether Exxon can be held liable for conditions of its facilities in Baton Rouge, Louisiana giving rise to Mr. Deaville's exposure to asbestos and subsequent development of mesothelioma?

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

e.  Whether Exxon had a duty to furnish and use safety devices and safeguards and was required to adopt and use methods and processes reasonably adequate to render Mr. Deaville's work at Exxon's refinery safe?

f.  Whether Exxon had a duty to inspect its premises and identify health hazards to those working on its premises, including Mr. Deaville?

g.  Whether Plaintiff Brent Deaville's employer's duty of care to him absolves Exxon, the premises owner, of its duty of care to provide a safe workplace to Mr. Deaville?

h.  Whether Exxon breached its duty to Mr. Deaville to provide a safe workplace?

i.  Whether Exxon is strictly liable to Mr. Deaville?

j.  Whether Turner (Nichols) had a duty to provide Mr. Deaville a safe place to work?

k.  Whether Turner (Nichols) breached its duty to Mr. Deaville?

l.  Whether Turner (Nichols) is strictly liable to Mr. Deaville?

m.  Whether J-MM owed a duty to warn Mr. Deaville of the hazards of asbestos-containing materials it sold and distributed?

n.  Whether J-MM breached its duty to warn Mr. Deaville of the hazards of asbestos-containing materials it sold and distributed?

o.  Whether JMM is strictly liable to Mr. Deaville?

p.  Whether Ferguson owed a duty to Mr. Deaville?

q.  Whether Ferguson breached this duty?

r.  Whether Ferguson is strictly liable to Mr. Deaville?

s.  Whether Defendant Ferguson Enterprises ("Ferguson") is, in fact or law, successor for liability purposes of Louisiana Utility Supply Co. ("LUSCO")?

t.  Whether the LUSCO was merged into LUS-ACQ while leaving only a corporate shell of the original LUSCO in existence?

u.  Whether LUS-ACQ (and then Ferguson) expressly purchased the *whole of the business* of LUSCO, including its liabilities?

v.  Whether the purchase agreement between LUS-ACQ and Ferguson constitutes a traditional merger conveying liabilities of LUSCO to Ferguson?

w.  Whether JMM and JM A/C entered into a joint venture for the purpose of manufacturing and marketing asbestos containing products, and, therefore, each responsible for the wrongful conduct of the other acting in furtherance of the joint venture?

x.  Whether Plaintiff is entitled to punitive damages against JMM?

y.  Whether Taylor-Seidenbach owed a duty to Mr. Deaville?

z.  Whether Taylor-Seidenbach breached this duty?

aa.  Whether Taylor-Seidenbach is strictly liable to Mr. Deaville?

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

bb. Whether Exxon is liable for the failure of the general contractors or subcontractors that employed Mr. Deaville to provide him with a reasonably safe place to work?

cc. The law applicable to contributory negligence and/or comparative fault?

dd. Whether Civil District Court, Parish of Orleans, is a proper venue for this action?

ee. Whether J-MM was negligent, and whether such negligence was a substantial contributing cause of Mr. Deaville's injuries?

ff. Whether Mr. Deaville's employers' actions or failures to act are superceding/intervening causes of Mr. Deaville's injuries?

gg. Whether Mr. Deaville's employers are sophisticated users of ACP?

hh. Whether Plaintiff's employer was a sophisticated user based on the information it knew or should have known as a professional plumbing contractor, specializing in the installation of underground piping systems?

ii. Whether Mr. Deaville was contributorily negligent?

jj. Whether Mr. Deaville is entitled to any damages?

kk. All legal questions implicit in or raised by the foregoing disputed issues of fact.

ll. Whether J-MM is entitled to a settlement credit for the fault of any party or non-party in this suit?

mm. Any issue of law contained in any motion pending before the Court.

nn. Whether Brent Deaville's employers were, during the time period of his employment, sophisticated consumers such that it was not necessary for Taylor-Seidenbach, Inc. to warn of any dangers of which it/they already was aware?

oo. Whether the liability of any entities who are presently in bankruptcy or who are not subject to being sued should be determined and reduce any award to the plaintiff?

pp. Whether the liability of any settling defendants should be determined and reduce any award to plaintiff?

qq. The negligence and/or fault of all parties other than Taylor-Seidenbach, Inc.?

rr. Whether Brent Deaville's employers were, during the time period of his employment, sophisticated consumers such that it was not necessary for Taylor-Seidenbach, Inc. to warn of any dangers of which it/they already was aware?

## 8.    EXHIBITS TO BE INTRODUCED AT TRIAL[28]

### a.  Plaintiff, Brent Deaville

Plaintiff's Exhibit List is attached hereto as **Exhibit A**.

### b.  Exxon Mobil Corporation

Defendant, Exxon Mobil Corporation's, Exhibit List is attached hereto as **Exhibit B**.

### c.  Ferguson Enterprises, Inc.

Defendant, Ferguson Enterprises, Inc.'s, Exhibit List is attached hereto as **Exhibit C**.

---

[28] Plaintiff reserves the right to object to the newly added exhibits, as parties have not met and conferred as to the admissibility of such exhibits.

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

**d.  J-M Manufacturing Company, Inc.**

Defendant, J-M Manufacturing Company, Inc.'s, Exhibit List is attached hereto as **Exhibit D.**

**e.  Taylor-Seidenbach, Inc.**

Defendant, Taylor-Seidenbach, Inc.'s, Exhibit List is attached hereto as **Exhibit E.**

**f.  Turner Industries Group, LLC**

Defendant, Turner Industries Group, LLC's, Exhibit List is attached hereto as **Exhibit F.**

9.  **LIST OF ALL DEPOSITION TESTIMONY TO BE OFFERED INTO EVIDENCE:**

**a.  Plaintiff**

Plaintiff, Brent Deaville, designates the following deposition testimony to be offered into evidence. These designations include all exhibits marked and/or referenced in the depositions set forth below:

   i.   Dr. Bryan Bienvenu taken October 5, 2020  (against all Defendants)

   ii.  Jennifer Sahmel taken September 25, 2020  (against all Defendants)

   iii. Gerald Terrell taken September 2, 2020 (against All Defendants)

   iv.  Ronald Bourgeois taken December 18, 1997  (against Exxon / TSI)

   v.   Henry Cox taken July 8, 1998  (against Exxon / TSI)

   vi.  Harold Johnson taken December 10, 1987 (against Exxon / TSI)

   vii. Marvin McCarty taken November 13, 1985  (against Exxon / TSI)

   viii. Donald McCollister taken May 12, 1999 (against Exxon / TSI / Turner)

   ix.  Jerry Wayne Purdom September 4, 2019  (against Exxon / TSI)

   x.   Vic Reno trial testimony  (against Exxon / TSI)

   xi.  Fred Schuber taken August 19, 1991 (against Exxon / TSI)

   xii. Ralph Shepard taken January 11, 2001 and January 24, 2013 (against Exxon / TSI)

   xiii. Calvin Underwood taken April 23, 2013 (against Exxon / TSI)

   xiv. Fred Venable taken January 27, 1984 and February 21, 1984 (against Exxon/TSI)

   xv.  Robert Rogers taken August 10, 2007 (against Ferguson)

   xvi. Fred Winkelman taken December 13, 2011 (against Ferguson)

   xvii. Lewis Armstrong taken October 8, 2014 (against JMM)

   xviii.  Jackie Kent taken June 30, 2014 and July 1, 2014 (against JMM)

See Defendants objections to Plaintiff's Page and Line Designations provided to the Court on October 22, 2020.

**b.  Exxon Mobil Corporation**

Exxon Mobil Corporation may call the following witnesses by deposition and/or trial

testimony:

TESTIMONY OF AND PERTAINING TO ANCO INSULATIONS, INC.

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL
DISTRICT COURT

i. RONALD BOURGEOIS - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 1442 DEPOSITION OF ANCO INSULATIONS, THROUGH THE TESTIMONY OF RONALD BOURGEOIS IN MORRIS EMERY, ET AL. V. OWENS-CORNING FIBERGLAS CORP., ET AL. TAKEN ON DECEMBER 18, 1997

ii. RONALD BOURGEOIS - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF RONALD BOURGEOIS TAKEN OCTOBER 28, 2010 IN THE MATTER ENTITLED NEAL ELDRIDGE V. THE MCCARTY CORPORATION, ET AL. CIVIL ACTION NO. 583,352, IN THE 19TH JUDICIAL DISTRICT COURT, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA

iii. RONALD BOURGEOIS - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF RONALD BOURGEOIS TAKEN FEBRUARY 28, 2012 IN THE MATTER ENTITLED JUANITA PAGE V. THE MCCARTY CORPORATION, ET AL. CIVIL ACTION NO. 2011-4899, IN THE CIVIL DISTRICT COURT, PARISH OF ORLEANS, STATE OF LOUISIANA

iv. HAROLD JOHNSON - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF HAROLD JOHNSON TAKEN NOVEMBER 1, 1979 IN LELOS WEDGEWORTH V. ARMSTRONG CORK COMPANY, ET AL., SUIT NO. J78-002(N), UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF MISSISSIPPI, JACKSON DIVISION.

v. HAROLD JOHNSON - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF HAROLD JOHNSON TAKEN NOVEMBER 10, 1980 IN COLUMBUS P. DAIGLE V. ARMSTRONG CORK CORPORATION, ET AL, SUIT NO. 79-194, SECTION A, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA, COLVIN W. DAIGLE V. FIBREBOARD CORPORATION, ET AL, SUIT NO. 79-404, SECTION B, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA, CHARLES E. VERRETT, SR. V. FIBREBOARD CORPORATION, ET AL., SUIT NO. 79-524, SECTION B, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA.

vi. HAROLD JOHNSON - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF HAROLD JOHNSON TAKEN FEBRUARY 3, 1986 IN THE MATTER ENTITLED IN RE: RALPH C. MANGUNO, CIVIL ACTION NO. 82-1570, IN THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA.

vii. HAROLD JOHNSON - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF HAROLD JOHNSON TAKEN DECEMBER 10, 1987 IN THE MATTER ENTITLED LOUIS O. AMEDEE V. AC&S, INC., ET AL. CIVIL ACTION NO. 87-399, IN THE UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA.

viii. HAROLD JOHNSON - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF HAROLD JOHNSON TAKEN FEBRUARY 1, 1990 IN THE MATTER ENTITLED RALPH MANGUNO, ET AL V. AC&S, INC., ET AL, CIVIL ACTION NO. 82-1570, IN THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA.

ix. HAROLD JOHNSON - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF HAROLD JOHNSON TAKEN AUGUST 5, 1998 IN THE MATTER ENTITLED MORRIS EMERY, ET AL V. OWENS-CORNING FIBERGLAS, CIVIL ACTION NO. 57,137, IN THE 23RD JDC, PARISH OF ASCENSION.

x. R. L. ANDERSON, JR. - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 11/01/1979 DEPOSITION OF R. L. ANDERSON, JR. TAKEN IN *LELOS WEDGEWORTH V ARMSTRONG CORK CORPORATION, ET AL,* SUIT NO. 78-002, SECTION J, UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF MISSISSIPPI, JACKSON DIVISION

xi. R. L. ANDERSON, JR. - EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 11/10/1980 DEPOSITION OF R. L. ANDERSON, JR. TAKEN IN *COLUMBUS P. DAIGLE V. ARMSTRONG CORK CORPORATION, ET AL,* SUIT NO. 79-194, SECTION A, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA; *COLVIN H. DAIGLE V.*

*FIBREBOARD CORPORATION, ET AL,* SUIT NO. 79-404, SECTION B, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA; AND *CHARLES E. VERRETT, SR. V. FIBREBOARD CORPORATION, ET AL,* SUIT NO. 79-524, SECTION B, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA.

xii.   R. L. ANDERSON, JR. – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 04/07/1988 DEPOSITION OF REUEL LEACY ANDERSON, JR. TAKEN IN *CHARLES L. ENTREMONT V. A.C. & S., INC., ET AL,* SUIT NO. 87-393-A; *JOSEPH S. MADISON V. A.C. & S., INC., ET AL,* SUIT NO. 87-392-A

xiii.  R. L. ANDERSON, JR. – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF R. L. ANDERSON, JR. TAKEN OCTOBER 3, 1996 IN THE MATTER ENTITLED CALVIN DALE ANDERSON, ET UX, V. THE DOW CHEMICAL COMPANY, ET AL., CIVIL ACTION NO. 14,716, IN THE 18TH JUDICIAL DISTRICT COURT, STATE OF LOUISIANA

xiv.   R. L. ANDERSON, JR. – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF R. L. ANDERSON, JR. TAKEN 07/29/1998 IN THE MATTER ENTITLED MORRIS EMERY, ET AL. V. OWENS-CORNING FIBERGLASS CORP, ET AL., CIVIL ACTION NO. 57,137, IN THE 23RD JUDICIAL DISTRICT COURT, PARISH OF ASCENSION, STATE OF LOUISIANA

## TESTIMONY OF AND PERTAINING TO J-M MANUFACTURING

i.    JAMES REICHERT – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF JAMES REICHERT TAKEN DECEMBER 19, 2017 IN THE MATTER ENTITLED RONALD H. BENNETT, ET AL. V. ETHYL CORPORATION, ET AL., CIVIL ACTION NO. 2015-3060, IN THE CIVIL DISTRICT COURT, STATE OF LOUISIANA

ii.   JAMES REICHERT – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE DEPOSITION OF JAMES REICHERT TAKEN MARCH 20, 2012 IN THE MATTER ENTITLED DAWN K. DAWES, INDIVIDUALLY AND AS THE PERSONAL REPRESENTATIVE OF THE ESTATE OF ALLEN H. DAWES V. CERTAINTEED CORPORATION, ET AL., NO. 10-2-11903-1 IN SUPERIOR COURT OF THE STATE OF WASHINGTON, IN AND FOR THE COUNTY OF PIERCE

### TESTIMONY OF AND PERTAINING TO THE MCCARTY CORPORATION

i.    MARVIN R. MCCARTY – EXXON'S DESIGNATIONS FROM THE 11/13/85 DEPOSITION OF MARVIN R. MCCARTY TAKEN IN *FRED M ESTATE V. THE MCCARTY CORPORATION, ET AL,* SUIT NO. 45-084, 34TH JUDICIAL DISTRICT COURT, PARISH OF ST. BERNARD, STATE OF LOUISIANA.

ii.   LAWRENCE J. ACOSTA, JR. – EXXON'S DESIGNATIONS FROM THE 4/2/1996 DEPOSITION OF LAWRENCE J. ACOSTA, JR. TAKEN IN LAWRENCE J. ACOSTA, JR. V. OWENS-CORNING, ET AL, SUIT NO. 416,479, 19TH JUDICIAL DISTRICT COURT, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA.

iii.  HAROLD THOMAS BRANTON – EXXON'S DESIGNATIONS FROM THE 3/2/2012 DEPOSITION OF HAROLD THOMAS BRANTON TAKEN IN JUANITA PAGE V. THE MCCARTY CORPORATION, ET AL, SUIT NO. 2011-4899, CIVIL DISTRICT COURT, PARISH OF ORLEANS, STATE OF LOUISIANA.

### TESTIMONY OF AND PERTAINING TO PNEUMO ABEX

i.    CHARLES BLACKWELL, M.D. – EXXON'S DESIGNATIONS FROM THE 1/24/2003 DEPOSITION OF CHARLES BLACKWELL, M.D. TAKEN IN *JOYCE SPRAGUE, ADMINISTRATIX OF THE ESTATE OF THOMAS SPRAGUE, DECEASED V. ABEX CORPORATION, ET AL,* SUIT NO. 97-2029, IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY PENNSYLVANIA.

E-Filed

ii.  CHARLES BLACKWELL, M.D. - EXXON'S DESIGNATIONS FROM THE 11/19/1984 DEPOSITION OF CHARLES BLACKWELL, M.D. TAKEN IN *St. Jacque v. Johns Manville*

iii.  WILLIAM V. BUCCELLA - EXXON'S DESIGNATIONS FROM THE 3/26/2009 DEPOSITION OF WILLIAM V. BUCCELLA TAKEN IN VIRGINIA BOHR, INDIVIDUALLY, AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF KELLEY BOHR, LISA HAGEN AND CAROL COLLINS V. CHRYSLER LLC, ET AL., NO. BC 388611, IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES.

iv.  ALBERT INDELICATO - EXXON'S DESIGNATIONS FROM THE 4/16/2018 DEPOSITION OF ALBERT INDELICATO TAKEN IN WILLIAM ALBERT HAWKINS, ET AL. V. BORGWARNER MORSE TEC, LLC, ET AL., NO. CAL17-06016, STATE OF MARYLAND, IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY.

v.  DR. TIMOTHY MERKEL - EXXON'S DESIGNATIONS FROM THE 3/12/2007 DEPOSITION OF DR. TIMOTHY MERKEL TAKEN IN IN RE: ASBESTOS LITIGATION, STATE OF DELAWARE, IN THE SUPERIOR COURT OF NEW CASTLE COUNTY.

vi.  DR. TIMOTHY MERKEL - EXXON'S DESIGNATIONS FROM 9/17/2008 DEPOSITION OF DR. TIMOTHY MERKEL TAKEN IN IN RE: EIGHTH JUDICIAL DISTRICT ASBESTOS LITIGATION, MICHAEL JOSEPH KOLASINSKI V. ACME LIQUIDATING CORPORATION, ET AL., INDEX NO. 2008-405, IN THE SUPREME COURT OF THE STATE OF NEW YORK, EIGHTH JUDICIAL DISTRICT, COUNTY OF ERIE.

vii.  DR. TIMOTHY MERKEL - EXXON'S DESIGNATIONS FROM 10/07/2009 DEPOSITION OF DR. TIMOTHY MERKEL TAKEN IN MARIA SANTANA V. BONDEX INTERNATIONAL, INC., ET AL., NO. 08-67301-CA-42, IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA.

TESTIMONY OF AND PERTAINING TO SHELL OIL COMPANY

i.  CAROLYN PHILLIPS - EXXON'S DESIGNATIONS FROM THE 6/19/2015 DEPOSITION OF CAROLYN PHILLIPS TAKEN IN MARGARET ANN TURNER, ET AL. V. ANCO INSULATIONS, INC., ET AL., NO. 47177-B, 18TH JUDICIAL DISTRICT COURT, PARISH OF IBERVILLE, STATE OF LOUISIANA.

ii.  GERALD R. FUCICH - EXXON'S DESIGNATIONS FROM THE 6/24/1986 DEPOSITION OF GERALD R. FUCICH TAKEN IN DONALD BECK V. FIBREBOARD CORPORATION, ET AL., NO. 84-1932, CIVIL DISTRICT COURT, PARISH OF ORLEANS, STATE OF LOUISIANA.

iii.  ANTHONY J. SCHILLACI - EXXON'S DESIGNATIONS FROM THE 6/24/1986 DEPOSITION OF ANTHONY J. SCHILLACI TAKEN IN DONALD BECK V. FIBREBOARD CORPORATION, ET AL., NO. 84-1932, CIVIL DISTRICT COURT, PARISH OF ORLEANS, STATE OF LOUISIANA.

TESTIMONY OF AND PERTAINING TO TURNER INDUSTRIES

i.  BILLY GUITREAU - EXXON'S DESIGNATIONS FROM THE 12/2/1998 DEPOSITION OF BILLY GUITREAU TAKEN IN LEE DEWEY HUGHES, JR., ET AL. V. OWENS CORNING, ET AL., 23RD JUDICIAL DISTRICT COURT, PARISH OF ASCENSION, STATE OF LOUISIANA.

ii.  DONALD McCOLLISTER - EXXON'S DESIGNATIONS FROM THE 5/12/1999 DEPOSITION OF DONALD McCOLLISTER TAKEN IN WANDA FAYE DURBIN, ET AL. V. OWENS CORNING CORP., ET AL., 18TH JUDICIAL DISTRICT COURT, PARISH OF IBERVILLE, STATE OF LOUISIANA.

iii.  BERT TURNER - EXXON'S DESIGNATIONS FROM THE 12/2/1998 DEPOSITION OF BERT TURNER TAKEN IN LEE DEWEY HUGHES, JR., ET AL. V. OWENS CORNING CORP., ET AL., 23RD JUDICIAL DISTRICT COURT, PARISH OF ASCENSION, STATE OF LOUISIANA.

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

TESTIMONY OF AND PERTAINING TO BORGWARNER

i.   RICHARD ANDERSON – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 6/21/2011 DEPOSITION OF RICHARD ANDERSON IN JOHN A. COWAN, ET AL. V. AGCO CORPORATION F/K/A ALLIS CHALMERS COMPANY, ET AL., IN THE SUPERIOR COURT OF NEW JERSEY, MIDDLESEX COUNTY

ii.  RICHARD ANDERSON – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 12/20/07 DEPOSITION OF RICHARD ANDERSON IN EDWARD GUERRA V. BONDEX INTERNATIONAL, INC., ET AL., IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF LOS ANGELES

iii. LOUIS R. MERZ – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 7/27/2006 DEPOSITION OF LOUIS R. MERZ IN JANET GALLANT PITTS, EXECUTRIX OF THE ESTATE OF WILLIAM E. PITTS V. BORG WARNER CORPORATION, ET AL., IN THE CIRCUIT COURT FOR THE COUNTY OF SPOTSYLVANIA, STATE OF VIRGINIA

iv.  LOUIS R. MERZ – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 12/18/2007 DEPOSITION OF LOUIS R. MERZ IN JEDWARD GUERRA V. BONDEX INTERNATIONAL, INC., ET AL., IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF LOS ANGELES

TESTIMONY OF AND PERTAINING TO FERGUSON ENTERPRISES, INC.

i.   ROBERT A. ROGERS – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 8/10/2007 1442 DEPOSITION OF FERGUSON ENTERPRISES, INC., THROUGH ITS REPRESENTATIVE, ROBERT A. ROGERS, IN THERESA CALAMIA, ET AL. V. OWENS-CORNING CORPORATION, ET AL., NO. 2006-13200, CIVIL DISTRICT COURT, PARISH OF ORLEANS

ii.  ROBERT A. ROGERS – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 2/1/2011 1442 DEPOSITION OF FERGUSON ENTERPRISES, INC., THROUGH ITS REPRESENTATIVE, ROBERT A. ROGERS, IN THERESA CALAMIA, ET AL. V. OWENS-CORNING CORPORATION, ET AL., NO. 2006-13200, CIVIL DISTRICT COURT, PARISH OF ORLEANS

iii. FRED WINKELMAN – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 12/13/2011 DEPOSITION OF FRED WINKELMAN IN THERESA CALAMIA, ET AL. V. OWENS-CORNING CORPORATION, ET AL., NO. 2006-13200, CIVIL DISTRICT COURT, PARISH OF ORLEANS

TESTIMONY OF AND PERTAINING TO HONEYWELL INTERNATIONAL, INC[29]

i.   JOEL COHEN – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 11/3/2015 DEPOSITION TESTIMONY OF JOEL COHEN TAKEN IN RONALD CONDA V. HONEYWELL INTERNATIONAL, INC, ET AL., SUIT NO. 62-CV-15-465, STATE OF MINNESOTA, COUNTY OF RAMSEY

ii.  JOEL COHEN – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 11/21/2013 DEPOSITION TESTIMONY OF JOEL COHEN TAKEN IN GRAHAM YATES V. AIR LIQUID SYSTEMS CORPORATION, ET AL, SUIT NO. 5:12-CV-00752-FL, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NORTH CAROLINA

iii. JOEL COHEN – EXXON MOBIL CORPORATION'S DESIGNATIONS FROM THE 3/22/2013 DEPOSITION TESTIMONY OF JOEL COHEN TAKEN IN SILAS J. MINTON, JR., V. BORGWARNER MORSE TEC, INC., ET AL, SUIT NO. BC 494 411, SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

---

29 Plaintiff has filed a motion to strike the late disclosed disclosures of these depositions.

E-Filed

FILED
2020 NOV 02  P 05:25
CIVIL
DISTRICT COURT

### c.  Ferguson Enterprises, Inc.

Ferguson Enterprises, Inc. adopts all Page and Line Designations filed by all co-
defendants in this matter.    Additionally, Ferguson has submitted objections to
designations as well as counter designations for the following depositions:

    i.   Robert Rogers taken August 10, 2007
   ii.  Fred Winkelman taken December 13, 2011
  iii.  Gerald Terrell taken September 2, 2020

### d.  J-M Manufacturing Company, Inc.

Defendant, J-M Manufacturing Company, Inc. designates the following testimony for
use at trial. These designations include all exhibits marked and/or reference in the
depositions as set forth in the below designations. J-MM reserves its right to supplement
these objections and designate additional direct, cross-examination, or re-direct
examination in response to any other parties' designations. J-MM also hereby joins in and
adopts any designations made by co-defendants that are not inconsistent with J-MM's
position in this case. J-MM also reserves its right to assert objections to any and all
designations.

    i.   John Orkish taken on February 3, 2020
   ii.  Richard Cronk taken on February 21, 2018
  iii.  Lloyd Ambler taken on July 19, 2007

### e.  Taylor-Seidenbach, Inc.

    i.   Ralph I. Shepard, taken on October 11, 1991, in *Gertie B. Goodman, et al v.
Avondale Industries, Inc., et al,* No. 365-627 in the 24th Judicial District Court
for the Parish of Jefferson.

### f.  Turner Industries Group, LLC

Defendant, Turner, designates the following testimony for use at trial. These
designations include all exhibits marked and/or reference in the depositions as set forth
in the below designations. Turner reserves its right to supplement these objections and
designate additional direct, cross-examination, or re-direct examination in response to
any other parties' designations. Turner also hereby joins in and adopts any designations
made by co-defendants that are not inconsistent with Turner's position in this case.
Turner also reserves its right to assert objections to any and all designations.

    i.   Bryan J. Bienvenue taken October 5, 2020 – Turner has no objections to plaintiff's
designations but requests counter-designations be added for complete testimony
   ii.  Donald McCollister taken May 12, 1999 – Turner has no objections to plaintiff's
designations but requests counter-designations be added for complete testimony
  iii.  Marvin R. McCarty taken on November 20, 1980 and November 13, 1985
  iv.  Carolyn Phillips taken on October 19, 2016 and November 12, 2015
   v.  James W. Hammon taken on November 13, 1989
  vi.  Ray Hymel taken on August 22, 2008 and September 23, 2008

### 10.  LIST AND BRIEF DESCRIPTION OF ANY CHARTS, GRAPHS, MODELS, SCHEMATIC DIAGRAMS, AND SIMILAR OBJECTS WHICH, ALTHOUGH NOT TO BE OFFERED IN EVIDENCE, RESPECTIVE COUNSEL INTEND TO USE IN OPENING OR CLOSING ARGUMENTS:

### a.  Plaintiff

Plaintiff intends to use a Keynote or PowerPoint presentation during opening and
closing statements that will contain text and graphical depictions to aid the jury in

FILED

2020 NOV 02  P 05:25

CIVIL
DISTRICT COURT

understanding certain medical issues and other evidence to be presented in the trial. Such depictions may include, but may not be limited to, the following: family photographs, medical diagrams and images, images of asbestos fibers, images of asbestos and non-asbestos products, images from exhibits, corporate logos, logos of scientific and regulatory organizations, and images from scientific literature. The presentations may also include charts, tables, diagrams, or graphs prepared by counsel to aid the jury in understanding the evidence presented or to be presented in trial. Additionally, Plaintiff may use certain physical demonstratives in opening or closing statements, including small exemplars of asbestos-cement pipe, half-round insulation sections, and/or asbestos-containing brake linings. Any such asbestos-containing exemplars would be contained in airtight sealed enclosures that would prevent any possibility of asbestos fibers escaping the enclosures.

### b. Exxon Mobil Corporation

Exxon intends to use a Keynote or PowerPoint presentation during opening and closing statements and witness examinations that will contain text and graphical depictions to aid the jury in understanding certain medical issues and other evidence to be presented in the trial. Such depictions may include, but may not be limited to, the following: medical diagrams and images, images of asbestos fibers, images of asbestos and non-asbestos products, images from exhibits, images from historical history, work history timelines, regulatory and images from scientific literature. The presentations may also include charts, tables, diagrams, or graphs prepared by counsel to aid the jury in understanding the evidence presented or to be presented in trial.

### c. Ferguson Enterprises, Inc.

Ferguson intends to use a PowerPoint (or similar) presentation during opening and closing statements and witness examinations that will contain text and graphical depictions to aid the jury in understanding certain medical issues and other evidence to be presented in the trial. Such depictions may include, but may not be limited to, the following: medical diagrams and images, images of asbestos fibers, images of asbestos and non-asbestos products, images from exhibits, images from historical history, work history timelines, regulatory and images from scientific literature as well as aids re: successor liability issues. The presentations may also include charts, tables, diagrams, or graphs prepared by counsel to aid the jury in understanding the evidence presented or to be presented in trial.

### d. J-M Manufacturing Company, Inc.

J-M Manufacturing Company, Inc. may offer charts, graphs, models, schematic diagrams, and similar objects related to the following for use as demonstrative exhibits: timeline of Mr. Deaville's work, timeline/chart of applicable regulations, standards and industry recommendations and warnings as it relates to ACP, chart of sales of ACP, diagram of business relationships and transactions, 3D print of pipe assembly, an actual snap cutter, and or an actual power saw.

J-M Manufacturing Company, Inc. intends to use a Keynote or PowerPoint presentation during opening and closing statements and witness examinations that will contain text and graphical depictions to aid the jury in understanding certain medical issues and other evidence to be presented in the trial. Such depictions may include, but may not be limited to, the following: medical diagrams and images, images of asbestos fibers, images of asbestos and non-asbestos products, images from exhibits, images from historical history, work history timelines, regulatory and images from scientific literature. The presentations may also include charts, tables, diagrams, or graphs prepared by counsel to aid the jury in understanding the evidence presented or to be presented in trial.

### e. Taylor-Seidenbach, Inc.

None on behalf of Taylor-Seidenbach, Inc.

### f. Turner Industries Group, LLC

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

Turner may offer charts, graphs, models, schematic diagrams, and similar objects related to the following for use as demonstrative exhibits: timeline of Mr. Deaville's work, and timeline/chart of applicable regulations, standards and industry recommendations and warnings as it relates to ACP.

## 11.  LIST OF WITNESSSES

### a.  Plaintiff'

#### Fact Witnesses

Plaintiff intends to call the following fact witnesses live:

i.  Plaintiff Brent Deaville
c/o The Cheek Law Firm, LLC
650 Poydras St., Suite 2310
New Orleans, LA  70130

ii.  Patsy Deaville, Spouse of Plaintiff
c/o The Cheek Law Firm, LLC
650 Poydras St., Suite 2310
New Orleans, LA  70130

Plaintiff and his wife, will testify to matters including, but not limited to Plaintiff Brent Deaville's pain, suffering, mental anguish, loss of enjoyment of a full and complete life (both in the past and in the future), the nature and duration of Mr. Deaville's illness and/or biographical matters, Mr. Deaville's medical treatment and resulting side effects. They will also testify as to the changes that occurred in Plaintiff's lifestyle, his physical and mental health, and his damages incurred as a result of his asbestos-related disease. They will also testify as to the changes that have occurred in the lifestyles of Plaintiff's family, including their physical and mental health, as a result of Plaintiff's illness and continuing treatment related to Mr. Deaville's terminal diagnosis of mesothelioma. To the extent Plaintiff's wife is aware of Mr. Deaville's work history, she may also generally confirm Mr. Deaville's work, but will not identify specific asbestos products or equipment. Further, Mr. Deaville will testify, consistent with the subject covered in his deposition, regarding his work history and exposure to asbestos he has incurred throughout his life.

iii.  Gerald Terrell, co-worker of Brent Deaville at John F. Sanchez Plumbing – Mr. Terrell and Mr. Deaville both worked for John Sanchez Plumbing. Consistent with his deposition, Mr. Terrell will testify about the work conditions and asbestos exposures of Mr. Terrell and Mr. Deaville while working for John Sanchez Plumbing.

iv.  Corporate Representative of Exxon Mobil Corporation

v.  Robert Haley, Corporate Representative of Ferguson Enterprises, Inc.

vi.  Corporate Representative of J-M Manufacturing Company, Inc.

vii. Corporate Representative of Taylor-Seidenbach, Inc.

viii.   Corporate Representative of Turner Industries Group, LLC

**Plaintiff intends to present the following additional fact witnesses through deposition testimony.**

E-Filed

i.   Dr. Bryan Bienvenu (against all Defendants)

ii.  Jennifer Sahmel (against all Defendants)

iii. Gerald Terrell (against Ferguson/JMM) – if Mr. Terrell is unavailable to appear live at trial

iv.  Ronald Bourgeois  (against Exxon / TSI)

v.   Henry Cox (against Exxon / TSI)

vi.  Harold Johnson (against Exxon / TSI)

vii. Marvin McCarty (against Exxon / TSI)

viii.   Donald McCollister (against Exxon / TSI / Turner)

ix.  Jerry Wayne Purdom (against Exxon / TSI)

x.   Vic Reno (against Exxon / TSI)

xi.  Fred Schuber (against Exxon / TSI)

xii. Ralph Shepard (against Exxon / TSI)

xiii.   Calvin Underwood (against Exxon / TSI)

xiv.    Fred Venable (against Exxon / TSI)

xv.  Robert Rogers (against Ferguson/JMM)

xvi.    Fred Winkelman (against Ferguson/JMM)

xvii.   Lewis Armstrong (against JMM)

xviii.  Jackie Kent (against JMM)

## Plaintiff's Expert Witnesses

Plaintiff intends to call the following expert witnesses live and/or via Zoom:

i.   **Dr. Arthur Frank**
     **Drexel University School of Public Health**
     **3215 Market Stret, 6ᵗʰ Floor, Nesbitt Building**
     **Philadelphia, PA  19102-1192**

Dr. Arthur Frank is board certified in internal and preventive medicine and is expected to testify and opine with a reasonable degree of medical and professional certainty regarding asbestos related issues including but not limited to the following described herein.

Dr. Arthur Frank is expected to testify to issues including: the field of occupational and environmental medicine; principles of occupational and environmental medicine relating to asbestos; the human respiratory process; the health hazards posed by the inhalation of asbestos; the diseases caused by asbestos; epidemiology of asbestos-related diseases; medical aspects of these particular diseases both generally and as applied to Plaintiff; the characteristics of asbestos fibers which make them particularly dangerous; the hazardous nature of dust from asbestos-containing products; the different asbestos fiber types; the carcinogenicity of all asbestos fiber types; the ability of all asbestos fiber types to cause mesothelioma; the ability of asbestos to cause mesothelioma at relatively "low-levels" of exposure and/or during brief and/or indirect exposures; the lack of a safe level of asbestos; government standards and regulations pertaining to asbestos; positions held by government and international health agencies regarding asbestos; the cumulative nature of asbestos exposure in causing disease and the causative effect of the different exposures that Plaintiff may have experienced; and the role of genetics and individual susceptibility in cancer induction.

Dr. Frank will further testify as to the diagnosis of Plaintiff's disease and the complete medical course of Plaintiff, including pain and suffering.

E-Filed

FILED

2020 NOV 02 P 05:25

CIVIL

DISTRICT COURT

Dr. Arthur Frank will testify that in his opinion, some industrial workers who use asbestos products will develop asbestosis. He will also testify that in his opinion, persons that were exposed to asbestos have a significantly greater risk of contracting asbestos-related diseases. The bases for these opinions will be his review of the medical literature concerning asbestos and asbestos related diseases and the results of his own research and the research of his cohorts at the Mt. Sinai Hospital in New York City. This is a world recognized center for research on asbestos disease and was headed by Dr. Irving J. Selikoff.

Dr. Frank will also testify on the physiology of the lungs and their reaction to asbestos exposure. He will detail the development of pulmonary fibrosis and pleural thickening and calcification in an asbestos exposed worker. He will express his opinion that asbestos causes scarring which is progressive in nature. He will also testify as to the clinical and physical manifestations in an asbestos worker who as asbestosis, and other asbestos related diseases, including lung cancer, mesothelioma and other cancers. He is further expected to provide testimony concerning the anatomic structure and functioning of the lung, the defense mechanisms and functioning of the lung in health and otherwise, the responses of the lung to various stimuli, and the role of various components of the respiratory system in the proper functioning of the lung. Dr. Frank is expected to describe and distinguish various types of asbestos fibers including but not limited to amosite, crocidolite, tremolite, chrysotile and Calidria; to describe the things which affect the ability of asbestos fibers to affect various structures within the respiratory system; and to describe the body's specific responses to fibers of asbestos that are inhaled whether or not they are retained. Dr. Frank is expected to testify by hypothetical question as to concepts such as latency, injury, dose, and general and specific causation.

It is further believed that Dr. Frank will distinguish various conditions, such as asbestosis, pleural changes and other non-malignant changes that may be attributable in some persons to the results of long term inhalation and retention of all fiber types of asbestos including but not limited to amosite, crocidolite, tremolite, chrysotile and Calidria. Dr. Frank is further expected to be able to testify concerning the circumstances under which exposure to asbestos may be associated with mesothelioma, and will testify concerning the results of his own experiences, the medical and scientific literature, and existing epidemiologic studies concerning associations between exposure to asbestos and the mortality and/or incidence of some forms of cancer.

Dr. Frank may review medical records, films and depositions of the Plaintiff's, and reports of other experts produced in this matter and will offer his opinion regarding Plaintiff's medical conditions and a review of Plaintiff's exposure history, including a scientific expression of such exposures. He will testify on the clinical, radiographic, histological, histochemical and immunopathologic findings of the Plaintiff based on review of the medical records as well as reports of other experts produced in this matter. He may also answer hypothetical questions based on exposure evidence, using his background and knowledge to offer his opinion as to what role, if any, asbestos may have played in an individual's medical condition. Dr. Frank is expected to testify that the Plaintiff's occupational exposure to asbestos-containing products made, distributed, sold, specified, and/or installed by the defendants in this case were all substantial contributing factors in the causation of the plaintiff's asbestos-related disease.

Dr. Frank is also expected to testify as to the specific requirements necessary for an exposure to be considered a substantial contributing factor to Plaintiff's mesothelioma, as well as a proximate cause of the mesothelioma. Dr. Frank will also testify as to hypothetical exposures based on the history of Plaintiff's exposure to asbestos and the potential of those exposures to cause mesothelioma. The hypothetical questions will be based upon the product identification deposition and evidentiary deposition of Plaintiff, as well as answers to interrogatories of defendants for asbestos-containing products and the reports of other experts produced in this matter. Dr. Frank is expected to testify that Plaintiff's occupational exposure to asbestos-containing

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

products made, distributed, sold, specified, and/or installed by the defendants in this case were all substantial contributing factors in the causation of Plaintiff's asbestos-related disease.

### ii. Kenneth S. Garza, CIH, MS, Sr. Project Manager
### Gobbell Hays Partners, Inc.
### 11550 IH-10 West, Suite 234
### San Antonio, TX 78230

Mr. Garza is an expert in the field of industrial hygiene as it relates to asbestos. Mr. Garza may testify to matters in industrial hygiene practices regarding asbestos exposure within specific industries and/or work activities. Mr. Garza is a Senior Project Manager for Gobbell Hays Partners, Inc., and consults on matters related to industrial hygiene matters. Mr. Garza is a Certified Industrial Hygienist (CIH). Mr. Garza is licensed by the Texas Department of State Health Services (TDSHS) as an asbestos consultant allowing for the inspection of, management of, sample collection of, and design for the abatement of asbestos-containing materials. Mr. Garza has conducted numerous worker interviews, conducted worksite inspections, and reviewed published and unpublished literature.

Mr. Garza may testify regarding the development and use of threshold limit values and the promulgation of state and federal regulations concerning the use of asbestos and exposure to asbestos in occupational settings. He may testify regarding the standards and regulations applicable to asbestos, the development of industrial hygiene procedures and technology and the role and impact of various studies, standards, regulations, reports and commentaries, in the industrial hygiene literature. He may also generally testify regarding asbestos bulk and air sampling data; asbestos fiber release and potential fiber release from various asbestos-containing material.

Mr. Garza may testify regarding the material and characteristics of Defendants' asbestos products, release of asbestos fibers from Defendants' products, industry and regulatory protocols, constituent analysis with respect to the nature of the materials and the identity of the manufacturer of the materials, product formula and product identification. He may further testify regarding the availability of materials as substitutes for asbestos and when information concerning these substitute materials appeared in the medical and scientific literature. He may also testify regarding the asbestos content of different products and/or pieces of equipment during different periods of time.

He may testify regarding bystander exposure to asbestos and that these are occupational hazards associated with asbestos and that they were significant contributing factors in Plaintiff's asbestos exposure. He may also testify regarding "household exposures" to asbestos and that these types of exposures are known to contribute to cause mesothelioma and other asbestos related diseases. He may testify regarding when it was known that bystander and household exposures to asbestos were known to cause disease.

He may testify that asbestos products are toxic and unreasonably dangerous, and that they are more dangerous than would be contemplated by the ordinary user with skills and characteristics common to the community. He may also testify that there are no safe levels of exposure to asbestos     dust. He may testify further that all types of asbestos represent occupational hazards and that in the science of industrial hygiene, all types of asbestos cause all asbestos diseases.

Mr. Garza may testify about the background levels of asbestos found in the ambient environment and asbestos exposure levels considered to be substantial for increased risk for asbestos-related disease.

Mr. Garza may also testify about his review of a person's work history, including the nature of the     working environment and facilities where the person worked, the ability or inability of certain     asbestos materials identified to contain and release

Deutilh v. ... .. Insulations, Inc. et al.          30          No. 2020-00011

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT
to persons )

asbestos fibers based on the industrial hygiene literature. This may include comparison of asbestos materials identified, asbestos materials worked with and/or around, to persons ) that are generally noted to be in a work environment described.

Mr. Garza has examined studies of asbestos fibers released into the breathing zone during ordinary and foreseeable operations of asbestos products. He may testify that during foreseeable uses of Defendants' asbestos products that those products released asbestos fibers into the breathing zone of individuals in levels that are above background. He may testify that impregnated and/or encapsulated products, when disturbed or abraded, can release asbestos fibers into the breathing zone of workers, like Plaintiff, in levels that are above background. He may compare and contrast such findings with other scientific studies. He may offer opinions concerning testing which has been performed on behalf of Defendants or the lack of testing on Defendants' products. He may testify from hypothetical facts and may give opinions regarding risk related to asbestos exposures. He may testify that asbestos dust levels measured in testing of asbestos products may be similar to or the same as another product.

### iii. Brent Staggs, M.D.
   1 Lile Court, Ste. 101
   Little Rock, Arkansas 72205

Dr. Staggs is a board certified pathologist and is expected to testify and opine with a reasonable degree of medical certainty regarding those matters set forth herein, and those matters referenced in any deposition.

Dr. Staggs is expected to testify and opine as to his pathological findings, the pathological effects of asbestos on the lungs and body and the various disease process it may cause and how asbestos related diseases are diagnosed. Dr. Staggs may testify and opine with a reasonable degree of medical certainty regarding Plaintiff medical condition(s), the cause(s) and consequences thereof, including but not limited to diagnosis, disability, prognosis, causation, pain and suffering, loss of a normal life, emotional distress experienced, and reasonable expense of necessary medical care, treatment and services received and may receive in the future. Dr. Staggs may testify concerning the biological and toxicological effects of asbestos as evidenced by himself and others, as to biological responses to brief exposures to asbestos, effects produced by various fiber types, concerning mechanisms of asbestos-induced diseases including fibrosis, carcinogenesis and concerning asbestos deposits and migration in and through the body and lungs, as well as the role of genetics and individual susceptibility in cancer induction.

Dr. Staggs may testify how asbestos causes disease, disability and death, that all fiber types cause asbestos related diseases, and that all asbestos related diseases are prevented in the same way, by preventing asbestos from being inhaled, so the means and methods for preventing asbestosis, lung cancer, mesothelioma and other asbestos-related diseases are all the same.

Dr. Staggs will provide the following general testimony: that a qualitative cumulative exposure model is the established and accepted method for evaluating exposure risk and causation for asbestos-related diseases; that under this model, risk and causation are evaluated based upon an individual's cumulative exposure to asbestos relative to latency; that under this model, greater exposures to asbestos involves greater risk and, conversely, lesser exposures involve lesser risk; that every exposure to asbestos above background contributes medically to the risk of developing asbestos disease, especially cancers; that every exposure to asbestos above background contributes medically to causing asbestos disease, especially cancer; that there is no threshold of exposure below which there is no increased risk for developing asbestos-related cancer and, therefore, no actual, identifiable safe level of exposure.

Dr. Staggs will evaluate Plaintiff's exposure history and testify concerning specific causation as follows: that Plaintiff's overall qualitative cumulative exposure was sufficient

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

to cause Plaintiff's asbestos disease; whether, based on hypothetical questions, a given set or subset of exposures including (but not necessarily) those attributable to a particular defendant or product type, are in his experience, expertise and opinion, a substantial contributing factor to causing Plaintiff's asbestos disease, in addition to medically contributing.

Dr. Staggs may testify that to the extent that Plaintiff and/or persons(s) working at or near asbestos products was exposed to asbestos dust and fibers from the defendant(s)' asbestos products and/or on defendant(s) premise, that such exposure would have contaminated Plaintiff and others working at or near asbestos containing products and contaminated his/her clothing resulting in an individual, bystander, take home, secondary and/or household exposure situation. Said exposure would have continued for an indefinite period of time, and thereby added to the cumulative dose of asbestos exposure.

For further conclusions and opinions, please see any and all depositions and/or trial testimony in this and other jurisdictions, and various literature and/or publications authored and/or co-authored by Dr. Staggs. The basis for Dr. Staggs' conclusions and/or opinions includes, but is not limited to, Dr. Staggs' review and knowledge of medical literature, his education and work experience, his research, research of others, his examination, patient history, review of medical records and reports, review of radiologic films and/or reports, review of deposition and/or trial testimony, and answers to interrogatories.

Plaintiff's above witnesses were listed in Plaintiff's Lay Witness List filed July 15, 2020 and Plaintiff's Expert Witness Disclosure filed June 1, 2020, in accordance with prior Court orders.

**b. Exxon Mobil Corporation**

    i.  Any witness listed by any other party to this lawsuit

    ii.  Brent Deaville

    iii.  Wayne Purdom, as corporate representative of Exxon. Any coworker of plaintiff, Brent Deaville

    iv.  Patsy Deaville

    v.  Dr. Brian Bienvenu, by deposition taken in this case

    vi.  Corporate representative of any defendant named in this suit

    vii.  Corporate representative of any employer of plaintiff, Brent Deaville

    viii.  Corporate representative of any current or former party to this lawsuit

    ix.  Custodian of records and personnel for any employer of plaintiff, Brent Deaville

    x.  Custodian of records for any defendant named in this suit

    xi.  Custodian of records for the Social Security Administration

    xii.  Any treating physicians of plaintiff, Brent Deaville, or any other physicians identified in discovery

    xiii.  Corporate representative of any other responsible party that is not a named defendant, including but not limited to manufacturers of asbestos-containing products identified in discovery

Deaville v. Anco Insulations, Inc. - et al.    12    No. 2020-00941

FILED

2020 NOV 02   P 05:25

CIVIL

DISTRICT COURT

xiv.   J. Leroy Balzer, Ph.D.—Dr. Balzer will testify concerning state-of-the-art, industrial hygiene matters, and occupational health issues and other issues identified in his deposition. He will also testify that Exxon was not negligent in any respect with regard to its direct employees or contractor employees. He will testify that reasonable precautions were taken with respect to the handling of asbestos at its facilities and that Exxon, at all times, acted as a reasonably prudent plant owner with respect to asbestos on its premises. This testimony is based on his review of testimony of Exxon employees and his review of Exxon's documents concerning exposures to asbestos on its premises. His testimony will also be based upon his state-of-the-art knowledge of the treatment of asbestos in the work place.

xv. Any expert listed by any other party to this litigation whose testimony is not inconsistent with Exxon's defenses in this litigation.

### c.   Ferguson Enterprises, Inc.

i.   Randy Daigle (live testimony via Zoom)
Tampa, Florida
Former LUSCO and Ferguson comptroller

Mr. Daigle will testify regarding the transactions between LUSCO, Clayton and Ferguson

ii. Bob Haley (live testimony)
39381 Bradbury Lane
Prairieville, LA 70769

Mr. Haley will testify regarding his former employment as outside Salesman of LUSCO, who was in charge of the Sanchez Plumbing account

iii. John Sanchez, Jr.
16826 Centurion Ave
Baton Rouge, LA 70816

Mr. Sanchez will testify regarding the work of Sanchez Plumbing and J&J Mechanical while Plaintiff was employed. He will also offer testimony as to the materials purchased and used by Sanchez Plumbing and J&J Mechanical during the Plaintiff's employment.

iv. Any witness listed and/or identified by any other party, regardless of whether that party settles or has already settled or is otherwise dismissed from this matter;

iv. Any expert listed by any other party to this litigation whose testimony is not inconsistent with Ferguson's defenses in this litigation.

### d.   J-M Manufacturing Company, Inc.

J-MM may call witnesses previously identified on its Witness List already filed in the

record, including, but not limited to, the following, live or by transcript:

i.   James Reichert (live). Mr. Reichert is a former J-M Manufacturing Company, Inc. employee. He is expected to testify regarding his years of experience at J-MM. Mr. Reichert is J-MM's corporate representative;

ii. Richard Cronk, *Wold v. APH Stores, Inc.*, et al, No. 62-CV-17-4346, Minnesota Second Judicial District Court for the Country of Ramsey taken on February 21, 2018. Richard Cronk is a former J-M Manufacturing Company, Inc. employee. He is expected to testify regarding his years of experience at J-MM;

iii. John Orkish (live or by deposition). John Orkish is a former salesperson for J-M Manufacturing Company, Inc. who will provide testimony concerning

communications with J-M Manufacturing Company, Inc.'s customers;

iv. Any witness listed and/or identified by any other party, regardless of whether that party settles or has already settled or is otherwise dismissed from this matter;

v. Corporate Representative / Person Most Knowledgeable of any asbestos-containing product manufacturer and/or supplier, of any and all past or present employers, identified in the deposition(s) of witnesses including, but not limited to the following: Exxon Mobil Corporation, Ferguson Enterprises, LLC, J and J Mechanical, Inc., Turner Industries, Anco Insulations, Inc., Pneumo-Abex Corporation, Shell Oil Company, Standard Motor Products, Inc., Union Carbide Corporation, BorgWarner Morse TEC, LLC, and The McCarty Corporation;

vi. Any persons with knowledge regarding the presence of asbestos-containing pipe in/at any and all work sites identified by Plaintiff and/or witnesses in this case including, but not limited to Shell Chemical, Vulcan Chemical, Exxon, and commercial worksites in and around Baton Rouge, Louisiana;

vii. Records custodians for the cities, villages, towns, and worksites by Plaintiff and/or witnesses in this case including, but not limited to Baton Rouge, Louisiana;

viii. Any witness, live or by transcript, offered in response to a 1442 and/or 30(b)(6) deposition noticed by any party not subject to objection by this Defendant;

ix. Any witness, live, by transcript, or other sworn testimony (including affidavits) necessary for the authentication of exhibits / documents as to which Plaintiff may raise an objection to at trial;

x. Any witness listed by any other party, or former party, on any, discovery responses;

xi. Any witness who will offer rebuttal testimony to Plaintiffs' fact and/or expert witnesses;

xii. Robert "Bob" Haley;

xiii. John Sanchez, Jr., individually and as the corporate representative pursuant to La. C.C.P. art. 1442 of J and J Mechanical, Inc.;

xiv. Gerald Terrell;

xv. Jennifer Pierce, PhD, MS
Cardno ChemRisk
30 N. LaSalle Street, Suite 3910
Chicago, IL, 60602
(312) 863-2341

Dr. Pierce is an industrial hygienist and safety professional, and may testify concerning her education, training and experience, as well as her factual observations, mental impressions, opinions, and the basis for them, in the following areas: properties, use of and historical developments concerning asbestos and asbestos-containing products; industry practice and standards in general and specifically concerning industrial hygiene and asbestos; state of knowledge concerning exposure to asbestos and effects thereof at relevant times; the process of establishing, historical development and significance of maximum allowable concentrations, permissible exposure limits, threshold limit values, regulatory standards, and similar concepts, in general and specifically with regard to asbestos at relevant times and the reasonableness of reliance upon established acceptable and safe levels of exposure to asbestos products during relevant periods of time; how potential exposure levels from various activities and jobs compared to then-existing threshold limit values at relevant times; employer's responsibility for employee/worker work site conditions and safety; and the reasonableness of conduct during relevant periods of time. She may offer opinions

FILED

2020 NOV 02   P 05:25

CIVIL

DISTRICT COURT

relating to the levels of asbestos exposure necessary to attribute the development of mesothelioma to any particular occupational exposure. Dr. Pierce may also testify regarding matters in response to testimony of Plaintiffs' experts. The basis for her mental impressions and opinions are her education, training, and experience, her review of pertinent literature, and her review of additional information pertinent to Plaintiff and/or this case.

Dr. Pierce may offer opinions regarding: Defendant's programs regarding industrial hygiene and health; Defendant's responsibility and actions; that Defendant was not negligent regarding asbestos and that it had an appropriate state of the art industrial hygiene program; and, that Defendant acted consistently with the state of the art and the knowledge of its industry at the relevant times. In addition, she may offer opinions regarding: safeguards, warnings, instructions, and other actions to be taken or provided by others than Defendant; use and availability of non-asbestos containing products; handling of asbestos, cigarette smoking and other causes of conditions that affected decedent; lack of exposure, de minimus or low dose exposure and in particular lack of exposure causing Plaintiff's condition; what, if anything identifiable, caused decedent's condition; potential exposure levels of onlookers compared to then-existing threshold limit values at relevant times; and one or more of the topics designated herein; she may give testimony regarding the level of fiber release, if any, from various products in the occupational setting; she may testify regarding an individual's risks or exposure to asbestos from different media, including, but not limited to, ambient air, industrial products and occupational settings; and she may also testify as to any matter raised by experts called by Plaintiffs or any Co-Defendant. Dr. Pierce's deposition fee will be provided prior to the deposition being conducted.

**J-MM reserves the right to call the following individuals pending a ruling from the Louisiana Fourth Circuit Court of Appeal on J-MM's Applications for Supervisory Writs on the Court's exclusion of these experts.**

i.   Charles A. Weaver, III, Ph.D.
Department of Psychology and Neuroscience
Baylor University
One Bear Place, Box 97334
Waco, TX 76798

Dr. Weaver is an expert in the areas of human memory and cognition. His research interests include memory, the relationship between confidence and memory, eyewitness memory and the effect of misleading information, "flashbulb memory", and repression and the false memory syndrome. If called to testify, Dr. Weaver will discuss the nature of memory, recall and retention. He will rely on general principles in the field of psychology and neuroscience and apply them to the factual allegations presented by plaintiff and other fact witnesses. Dr. Weaver will discuss how memories can be altered by events which take place or information which is learned after the original circumstances. Dr. Weaver will also discuss his laboratory research and discuss his findings, and the results of studies available in the published literature, that support his opinions.

ii.   Rachel P. Maines, Ph.D.
School of Electrical and Computer Engineering
Cornell University
726 University Avenue Room 311
Ithaca, NY 14853
607-351-4012

Dr. Rachel Maines is a historian of technology with a doctorate from Carnegie-Mellon University in applied history and social science. Since October 2016, Dr. Maines has been a Seminar Associate of the Columbia University Seminar in History and Philosophy of Science, and she was previously a visiting scientist with Cornell University's School of Electrical and Computer Engineering. She has researched, written and published on issues relating to the history of the use of asbestos and asbestos containing product based on her training as a historian, her relevant experience, publications, and review of materials, Dr. Maines may give testimony regarding the decision environment that resulted in the use of asbestos-cement pipe in the 1980s, which included the state of engineering standards development for pipe technology, Federal, state

FILED

2020 NOV 02   P 05:25

CIVIL
DISTRICT COURT

and local approvals and specifications for water and sewer pipe; the state of knowledge of and approvals for, other pipe assemblies for these types of service; labor regulations, water quality regulations, pipe testing protocols, and recognition by Federal and state agencies of the practical constraints imposed by soil types and chemically-aggressive waters. She will testify as to the historically-perceived benefits of asbestos-cement pipe assemblies over other assemblies, such as iron pipe, in particular types of water and sewer service. She will also testify regarding history and evolution of federal state and local regulations regarding the use of asbestos. She may also testify as to the state of knowledge of the hazards of asbestos during this particular time frame with a particular emphasis on the state of knowledge for asbestos cement pipe industry.

The basis for her opinion will include but are not limited to: (1) a historical overview of the development of water and waterborne sewer systems in the United States; (2) a review of the development of various plumbing and sewer codes and their adaption by state, local, and federal agencies; (3) State, Federal, and Municipal regulations approving and oftentimes specifying asbestos cement pipe for use in underground water and sewer systems; (4) the perceived technological benefits of asbestos cement pipe in water and sewer systems as compared to other materials over time, based on, inter alia, the engineering and sanitation history of the aforementioned regulations, specifications, and standards; (5) the state of the art regarding the knowledge of the hazards of asbestos (6) the government's efforts to regulate the use of asbestos; (7) industry and organized labor efforts to educate workers about the hazards of asbestos over time; (8) efforts by manufacturers, distributors and water utility organizations to educate installers of asbestos cement pipe on the appropriate work practice methods to minimize exposure to asbestos; and (9) the historical availability, codification, and dissemination of information relating to proper work practices with asbestos cement pipe in the aforementioned codes, regulations, and standards, along with publications by industry.

Dr. Maines' testimony may reference her review of federal and state laws and regulations, industry and company specific publications and documents, periodicals and newspapers, engineering literature, technical literature, and journals, including but not limited to: standards and test results published by the American Society of Mechanical Engineers (ASME), the National Fire Protection Association (NFPA), the American Society for Testing Materials (ASTM), the National Board of Fire Underwriters (NBFU), the American National Standards Institute (ANSI), the Compressed Gas Association, The American Petroleum Institute (API), the Society of the Plastics Industry (SPI), the American Welding Society, the American Gas Association, the National Association of Corrosion Engineers (NACE), Buildings Officials and Code Administrators International (BOCA), the Southern Standard Buildings Code Congress (SBCC), the Society of Automotive Engineers (SAE), the International Association of Plumbing and Mechanical Officials (IAMPO), the American Water Works Association (AWWA), American Cement Pipe Producers Association (ACPPA); the National Bureau of Standards of the US Department of Commerce, the Occupational Safety and Health Administration (OSHA), the U.S. Public Health Service, as well as federal, state, and local building codes; and documents regarding asbestos and asbestos cement pipe from unions and manufacturers.

The basis for Dr. Maines' testimony will be her experience, education, research, and review of the applicable literature and any case specific materials supplied to her.

iii.  John D. Osternas, Ph.D, P.E.
      Exponent
      149 Commonwealth Drive
      Menlo Park, California 91025

Dr. Osternas has a Ph.D. in Civil Engineering from Stanford University, and is licensed as a Civil Engineer in California, in 16 other states, and in the District of Columbia. He has been a practicing civil engineer for over 40 years, having obtained a B.S. in Civil and Environmental Engineering in 1976 from the University of Wisconsin. He has decades of experience in construction and engineering issues and is a licensed general contractor, a fellow with the American Society of Civil Engineers, and has published over 40 articles on various aspects of civil engineering and construction. He has studied issues such as wastewater treatment, water supply, fluid mechanics, design of municipal water and sewer systems, geotechnical engineering, and construction engineering, including construction

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

means, methods, sequencing, and management. He can produce, read, interpret and explain engineering drawings and construction plans, and has worked on hundreds of construction sites over his career.

Dr. Osteraas may testify concerning plans, blueprints, specifications, invoices, purchase orders, work logs and reports, and other records pertaining to a particular job, including what those records and his experience indicate about what materials were used, and the work practices and sequencing or construction management involved in the use of those materials. He may conduct site inspections, again to determine, based on the inspection and his experience, what materials were used during construction or renovation of the job site and the work practices, sequencing and management involved with those materials.

Dr. Osteraas may testify regarding the accepted processes for residential, commercial and industrial construction, what various codes, specifications and work practices required. He may further discuss the types and sequencing of work performed by various trades on residential, commercial, and industrial construction projects.

Dr. Osteraas may testify about his experience with asbestos cement pipe and other types of underground water, sewer and storm drain piping, including what were the products of choice in different time periods and areas of the U.S., the life cycle of different types of underground water, sewer and storm drain pipe, the need for and methods of repair of various types of underground piping, and similar issues.

### e.  Taylor-Seidenbach, Inc.

i.  Brent Deaville - will be called to testify regarding his work, smoking and health backgrounds;

ii.  Representative of any co-defendant - fact testimony regarding Brent Deaville's employment, product testimony, testimony regarding contracting work, testimony regarding product sales, testimony regarding business operations;

iii.  John Taylor (by deposition) - fact - will be called to testify regarding employment at Taylor-Seidenbach, Inc. and Reilly-Benton and products sold by each of these companies;

iv.  Fred Schuber, 2431 Clio Street, New Orleans, Louisiana - fact - will be called to testify regarding employment with Eagle, Inc. and products sold by Eagle, Inc.;

v.  Warren Watters - 2314 Camp Street, New Orleans, Louisiana - fact will be called to testify regarding corporate history and employment for Reilly-Benton and products sold by Reilly-Benton;

vi.  Dr. Robert N. Jones - pulmonary expert - Tulane University Medical Center, 1700 Perdido Street, New Orleans, Louisiana 70112;

vii.  Dr. W. Brooks Emory, Ochsner Clinic, 1514 Jefferson Highway, New Orleans, Louisiana 70121 - pulmonary medical expert;

viii.  Kenneth Boudreaux, Ph.D. or representative of his office, 1424 Bordeaux Street, New Orleans, Louisiana 70115 - expert economist;

ix.  Ralph Shepard (by deposition), 731 South Scott Street, New Orleans, Louisiana - fact - will testify regarding employment with Taylor-Seidenbach, Inc.;

x.  Dr. Richard Reed - medical expert - pathologist;

xi.  Dr. Robert O'Neil, 1910 King Bee Road, Perkinston, Mississippi 35973 - medical expert - pathologist;

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

xii. Dr. Phillip Cagle, Baylor College of Medicine, Department of Pathology, One Baylor Plaza, Houston, Texas 77030 – expert pathologist;

xiii. Victor Roggli, M.D., Duke University Medical Center, 2nd Floor, Green Zone, Room M243, Erwin Road, Durham, NC 27710;

xiv. Dr. Ewing W. Cook, Jr., 2700 Napoleon Ave., New Orleans, Louisiana – medical expert;

xv. Any and all physicians who have ever examined and/or treated Brent Deaville;

xvi. Representative of any co-defendant who may settle with plaintiff prior to the trial of this matter;

xvii. Dr. Ernest Dixon, 6305 Evermay Drive, McLean, VA 22101; Medical expert who will testify regarding knowledge and awareness of the hazards of asbestos during the years Brent Deaville was employed;

xviii. Howard E. Ayer, University of Environmental Health Foundation, 3223 Eden Avenue (ML 56), Cincinnati, OH 45267-0056; Industrial Hygienist;

xix. Representative of Anco, McCarty, Nichols, Exxon Mobil, Shell Oil, Shell Chemical, Vulcan Chemical, Ferguson Enterprises, JM-Manufacturing and any other employer/work site where it is alleged that Brent Deaville was exposed to asbestos; Testimony regarding Brent Deaville's employment/exposure;

xx. Representative of Taylor-Seidenbach, Inc. 731 Scott Street, New Orleans, LA;

xxi. Any witness listed or called by any other party to this litigation;

xxii. Taylor-Seidenbach, Inc. reserves the right to supplement, modify and amend its listing of witnesses when and if additional information, including the complete listing of the plaintiff's witnesses, becomes        available to it.

xxiii. These witnesses were identified in accordance with prior court orders.

**f.  Turner Industries, Group, LLC f/k/a Nichols Construction Company, LLC, f/k/a Nichols Construction Corporation, f/k/a Turner Industries, LLC f/k/a National Maintenance Holding Company, LLC, f/k/a National Maintenance Corporation**

Turner has filed a Witness List in accordance with prior Court orders. Turner may call witnesses previously identified on its Witness List already filed in the record, including, but not limited to, the following, live or by transcript:

i.    Family members of Brent Deaville.

ii.   Any former co-worker of Brent Deaville, live or by deposition, to testify regarding product identification and conditions relative to any alleged asbestos exposure.

iii.  A representative of any alleged manufacturers and/or suppliers of asbestos-containing products, live or by deposition, to testify regarding product identification and product manufacture.

iv.   Corporate representatives of any party that was at any time made a defendant to this case.

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

v.  Representatives and/or employees or former employees of any and all Defendants, even if that Defendant has been dismissed, settled or is otherwise no longer involved in this litigation.

vi.  A representative of any work site or premise owner where any plaintiff may have worked concerning dates of employment, job duties, asbestos-containing products used at the work site or premises, safety rules, regulations or procedures, including information communicated to the plaintiff concerning the safe handling of asbestos personal protection devices and asbestos hazards.

vii.  All doctors, medical records custodians, physicians, health care providers and/or other medical personnel who treated, evaluated and/or examined Plaintiff at any time during his lifetime.

viii.  Any and all records custodians or representatives of any Union to which Plaintiffs were members.

ix.  Mr. Bert Turner (deceased – by deposition) – Mr. Turner will testify regarding Turner's operations.

x.  Any witness, including expert witness, listed, or otherwise identified in discovery responses, by any party to this litigation, whether that party has settled, been dismissed or is no longer a party to this matter.

xi.  Any expert witness needed to testify concerning the relevancy or reliability of the opinions of any expert witness designated by the plaintiffs, third party plaintiffs or any other party in connection with any motion to strike or limit such testimony at trial and any expert witness listed by the plaintiffs or whom has previously testified for the plaintiff's counsel in any asbestos related matter.

xii.  Any witness listed by plaintiffs or any other party which pertains to the liability of codefendants and/or settled entities and/or persons or related, in any way, to codefendants or settled entities or persons, regardless of whether that party settles or has already settled with plaintiffs or is otherwise dismissed from this matter.

xiii.  Any records custodian or other witness needed to establish the evidentiary foundation for any document or exhibit.

xiv.  Any witness needed for impeachment or rebuttal purposes.

xv.  Any witness who has been deposed in this or any other asbestos litigation.

xvi.  Any witness whose identity may become known in the course of ongoing discovery in this matter.

Defendant, Turner, reserves the right to call any expert or fact witness designated by any other party to this litigation whether that party has settled, been dismissed or is no longer a party to this matter.

### 12.  PROPOSED JURY INSTRUCTIONS / SPECIAL JURY INTERROGATORIES

Pursuant to the Court's Order these will be submitted directly to the Court and to opposing counsel by parties five working days before trial.

### 13.  OTHER MATTERS THAT MIGHT EXPEDITE A DISPOSITION OF THIS CASE

None.

### 14.  This Joint Pre-Trial Order has been agreed upon by all parties in this matter and has been executed by counsel below.

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

15.  **POSSIBLITY OF SETTLEMENT OF THIS CASE WAS CONSIDERED:**

Settlement has been considered, and the parties will continue to discuss.

Dated: November 2, 2020                    Respectfully Submitted,


By:   /s/ Melissa Schopfer
**SIMMONS HANLY CONROY LLC**
Melissa Schopfer, admitted *pro hac vice*
Jean-Michel Lecointre, admitted *pro hac vice*
Gary DiMuzio, *admitted pro hac vice*, TA
Michael Hibey, *admitted pro hac vice*
One Court Street
Alton, IL 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com

-AND-


**THE CHEEK LAW FIRM LLC**
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone: 504-304-4333
Fax: 504-324-0629
LCheek@thecheeklawfirm.com
JStRomain@thecheeklawfirm.com
Asbestos@thecheeklaw.firm.com

-AND_


**STUEMKE LAW FIRM PLLC**
Jay Stuemke, admitted *pro hac vice*, TA
PO Box 92970
Southlake, TX 76092
Telephone: 817-379-1149
jay@stuemkelaw.com


**COUNSEL FOR PLAINTIFF**


BIENVENU, BONNECAZE, FOCO,
VIATOR & HOLINGA, APLLC


By:   /s/ Lexi T. Holinga
David M. Bienvenu, Jr., #20700
John Allain Viator, #25915
Lexi T. Holinga, #30096
Anthony Lascaro, #32546
Melissa Jade Shaffer, #37867
Thomas C. Naquin, #38847
4210 Bluebonnet Blvd.
Baton Rouge, LA 70809
Phone: (225) 388-5600
Fax: (225) 388-5622

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

asbestos@bblawla.com

and

CHEHARDY SHERMAN WILLIAMS
James M. Williams (#26141)
Inemesit U. O' Boyle (#30007)
Daniel E. Buras, Jr. (#26226)
Patrick R. Folette (#34547)
Erin B. Rigsby (#37374)
Nicholas R. Varisco (#38431)
Edwin T. Murray (#38963)
One Galleria Boulevard, Suite 1100
Metairie LA 70001
Phone: (504) 833-5600
Fax: (504) 833-8080

**ATTORNEYS FOR EXXON MOBIL
CORPORATION**

PUGH, ACCARDO, HAAS, RADECKER
& CAREY, LLC

By: /s/ Donna M. Young
LAWRENCE G. PUGH, III (#17351)
DONNA M. YOUNG (#20936)
1100 Poydras Street – Suite 3300
New Orleans, Louisiana 70163-
3300 Telephone: (504) 799-4500
Facsimile: (504) 799-4520

**COUNSEL FOR FERGUSON
ENTERPRISES, INC**

Respectfully submitted:

By:  Alexandra E. Rossi (with permission)
Gregory M. Anding (#23622), Trial Attorney
Gayla M. Moncla (#19713)
Jay M. Jalenak, Jr. (#20234)
Karli G. Johnson (#26304)
Allison N. Benoit (#29087)
Alexandra E. Rossi (#35297)
Adrienne M. Wood (#38448)
400 Convention Street, 7th Floor
P. O. Box 3513
Baton Rouge, LA 70821
Telephone: (225) 387-0999
Facsimile: (225) 388-9133
asbestos@keanmiller.com

AND

Janice M. Culotta (#23460)
Georgia N. Ainsworth (#35022)
909 Poydras Street, Suite 3600
New Orleans, Louisiana 70112
Telephone: (504) 585-3050

E-Filed

FILED

2020 NOV 02  P 05:25

CIVIL

DISTRICT COURT

**ATTORNEYS FOR J-M**
**MANUFACTURING COMPANY, INC.**

Respectfully submitted,

HAILEY, McNAMARA, HALL,
LARMANN,& PAPALE, L.L.P.

By:   /s/ C. Kelly Lightfoot

**C. KELLY LIGHTFOOT, #17027**
**EDWARD J. LASSUS, JR., #08116**
Suite 1400, One Galleria Boulevard
P. O. Box 8288
Metairie, Louisiana 70001-8288
Telephone: (504) 836-6500

**COUNSEL FOR TAYLOR-**
**SEIDENBACH, INC**

Respectfully submitted,

**BLUE WILLIAMS, L.L.P.**

By:  Cynthia C. Roth (with permission)
CYNTHIA C. ROTH (La. Bar #25584)
PAUL D. PALERMO (La. Bar #19725)
3421 North Causeway Blvd., Suite 900
Metairie, Louisiana 70002
Telephone: (504) 831-4091
Facsimile: (504) 837-1182

**COUNSEL FOR DEFENDANT,**
**TURNER INDUSTRIES GROUP, L.L.C.**

By:

**HON. CHRISTOPHER J. BRUNO**
**CHIEF JUDGE**